**FARR et al. v. HAIN S. S. CO., Limited.**

**THE TREGENNA.**

**No. 326.**

Circuit Court of Appeals, Second Circuit.

Aug. 1, 1941.

---

L. de Grove Potter and Kirlin, Campbell, Hickox, Keating & McGrann, all of New York City (Harold B. Finn and William P. Lage, both of New York City, of counsel), for appellant.

Forrest E. Single, of New York City (William Weymar, Jr., of New York City, of counsel), for appellees.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The case arises upon an appeal from an interlocutory decree in the admiralty, which disposed of two proceedings: first, of a petition for limitation of liability filed by the Hain Steamship Company, Ltd. (of which we shall speak as "Hain"), owner of the "S. S. Tregenna" in which the firm of Farr & Company (whom we shall collectively call "Farr") were the only claimants; and, second, of a libel for freight filed by "Hain" against "Farr." "Farr" bought certain parcels of sugar in Cuba which they chartered the "Tregenna" to carry; some of the sugar was damaged, owing to a strand in the harbor of San Pedro de Macoris, San Domingo, and "Farr" made claim for the loss. "Hain" filed a libel to recover freight for the carriage of the undamaged Cuban sugar, transferred to another bottom, from San Pedro to destination, Queenstown; this claim the judge allowed and, as "Farr" has filed no assignment of errors, we shall not consider the merits of that decision. The questions raised by the appeal are (1) whether the "Tregenna" deviated; (2) if so, whether "Farr" excused the deviation; (3) if "Farr" did excuse it, whether certain exceptions in the "Tregenna's" charter-party protected "Hain" even though the strand was caused by the negligence of the "Tregenna's" master.

The facts, as the district judge found them, were as follows. "Farr" were sugar dealers, doing business in New York, who on July 16, 1930, through their brokers, Battie & Company, executed a voyage charter-party with "Hain" for the "Tregenna" —the firm of Simpson, Spence & Young (whom we shall collectively call "Simpson"), ship brokers in New York, signing for "Hain." The important part of this charter was as follows: "the said Steamer * * * shall with all convenient speed sail and proceed to Cuba, and there load * * * at one or two safe ports on the South side and at one safe port on the South side of San Domingo as ordered from the Factors of the said Charterers a full and complete cargo of Sugar in bags not exceeding 7,770 tons net nor less than 7,030 tons net, which the said Charterers

bind themselves to ship." The relevant exceptions read as follows: "stranding, and other accidents of Navigation excepted, even when occasioned by negligence, default, or error in judgment of the Pilot, Master, mariners or other servants of the Shipowners." Later: "This Charter is subject to all the terms and provisions of and all the exemptions from liability contained" in the Harter Act, 46 U.S.C.A. § 190 et seq. On July 16, 1930, Battie & Company instructed "Simpson" that the first port of loading in Cuba would be Casilda, naming "Farr's" agents to whom the captain was to report; and that the second port would be Santiago de Cuba, naming at that port Wetmore & Bucher, as shipper's agents. On the 17th, Battie & Company advised "Simpson" that the port of loading in San Domingo would be San Pedro de Macoris and named Tatem & Co. as shipper's agents. On July 17th, "Simpson" cabled to the "Tregenna" in care of "Farr's" agents at Casilda as follows: "Second port Santiago apply Wetmore & Bucher, third port San Pedro de Macoris apply Tatem & Co." This telegram never reached Casilda, which had no telegraph office; it was received at the nearby town of Trinidad, where the telegraph agent gave a copy of it to a person who was going by motor to Casilda, and whom he told to deliver it to the "Tregenna's" captain. "Simpson" never of course received any acknowledgment of its receipt, nor did they send any confirmation by mail, nor take any steps to confirm delivery. On July 19th "Farr's" agents in Casilda received a letter from their agents in Havana, directing the "Tregenna" to go from Casilda to Santiago de Cuba, and to report to Wetmore & Bucher. In accordance with these instructions the master left Casilda on July 24th, having lifted 1,867 tons. Meanwhile, "Simpson" on the 18th mailed a copy of the charter to the captain at Santiago which he received on the 26th. At that port the vessel lifted some 3,000 tons more, completing her lading on July 29th. That was the day on which "Farr" had instructed Wetmore & Bucher that the vessel was to clear, and she did so clear, but for Queenstown (via Norfolk for bunkers) having lifted 4,990 tons in all, which left unladed 2,040 tons of the minimum stipulated in the charter. The master did not communicate with "Hain" before sailing, or do more than ask Wetmore & Bucher whether they were sure that Santiago was the last loading

point; but he made a notation upon the bills of lading at Santiago that dead freight was to be paid on 2,040 tons.

In fulfillment of much earlier negotiations, on July 28th "Farr" executed a sub-charter with the Cuban Dominican Sales Corporation to load sugar on the "Tregenna" at some safe port on the south side of San Domingo, not less than 2,040 tons. Wetmore & Bucher at Santiago wired "Hain" in England and "Simpson" in New York that the ship was leaving Santiago with a short cargo, and "Farr's" agent at Havana cabled the same information to them in New York. Thereupon, "Simpson" and "Hain" both wired Wetmore & Bucher that the vessel should have gone to San Pedro de Macoris, upon the strength of which Wetmore & Bucher sent a wireless to the master to proceed to that place. This wireless the master received at noon on July 30th when he was twenty-eight hours out from Santiago; he immediately turned about for San Pedro, being obliged to coast the north side of the island of San Domingo instead of the south side, and thereby increasing the voyage between Santiago and San Pedro by two hundred sixty-five miles. ("Simpson" also sent him a wireless but he did not receive it until after he had turned.) When "Farr's" Havana agents learned by cable that the ship had left for Queenstown with a short cargo they took no steps to find out what "Hain" or "Simpson" or Wetmore & Bucher were doing; and "Farr" learned of her arrival at San Pedro a few hours after she began to lade the Dominican sugar at that port, and allowed her to complete her lading without protest or reservation of any rights arising from the deviation. At San Pedro the "Tregenna" lifted 2,789 more tons of sugar on behalf of "Farr's" sub-charterer, breaking ground on August 6th. On her way out she took a strand in the harbor, which so seriously damaged her that the entire cargo had to be discharged, some of it in damaged condition. "Hain" sent forward the undamaged part by another vessel to destination, and the "Tregenna" went in ballast to Newport News for permanent repairs.

The judge thought that since the "Tregenna" was guilty of a deviation, "Hain" became absolutely liable, and that "Farr's" inaction did not excuse the breach, in this regard differing from a judgment of the House of Lords upon the same charter-party in Tate & Lyle, Ltd. v. Hain Steam-ship Company, Ltd., 41 Commercial Cases 350. He therefore did not have to decide, and did not decide, whether the strand was due to negligence of the ship's master, though incidentally he did find her unseaworthy for not having the most recent charts for the harbor of San Pedro and for starting out from that harbor without a pilot. He set off against "Hain's" liability for damages the freight upon the carriage of the undamaged sugar from San Pedro to Queenstown.

■■ The first question is as to whose was the fault in failing to advise the master to call at San Pedro. "Hain" concedes, as we understand it, that after Battie & Co. told Reddie, the New York chartering clerk of "Simpson," that the first port of call would be Casilda, "Simpson" acted with "Hain's" authority in cabling this to the master at Kingston; but "Hain" insists that "Simpson's" authority ended there, for it had not deputed them to advise the master of the later ports of call. That is indeed a strange limitation, which we should be slow to accept if there was nothing more. But there was: "Simpson's" London house had already cabled Reddie on the 16th: "We confirm charter telegraph name of charterers please convey orders to captain." "Hain" does not suggest that this was unauthorized, and if Battie & Co. had known the later ports of call when they told Reddie that Casilda would be the first, there could have been no question of "Simpson's" authority to advise the master of these as well. Furthermore, on July 31, after the deviation had taken place and after the "Tregenna" had turned back to San Pedro, "Simpson's" London house wrote "Hain's" agents fully disclosing the order they had undertaken to give to the master at Casilda, and accounting for its failure to reach him. Neither these agents nor "Hain" then intimated that "Simpson" had exceeded their authority. We are in accord with the judge in holding that they had not. Of course it makes not the slightest difference that "Simpson" chose "Farr's" agents at Casilda or at Santiago to act for them pro hac vice; it remained "Simpson's" duty to advise the master. Furthermore the master got a copy of the charter-party at Santiago which showed that the ship was to call at some Dominican port. He did nothing to satisfy himself why that port had been omitted, and why he was sailing with only five-sevenths of a cargo, beyond asking Wetmore & Bucher

for information, which they did not have, and might very well not have, as he should have known. It appears to us that this was not the measure of his duty; but that before breaking ground at Santiago he should at least have tried to learn why the venture had apparently changed so much.

■■ The next question is whether the deviation so proved was excused. As Scrutton, L. J., said in Tate & Lyle, Inc. v. Hain Steamship Co., Inc., supra, "there is nothing peculiarly nautical in such a law"; a deviation is no more than a breach of the contract of carriage. Nevertheless it has indeed always been treated as ipso facto a more serious breach than if it occurred on land; it goes to the essence of the venture, and it is clear enough why it should be so treated in extreme cases, though it is not entirely apparent why it should always be. Indeed, it may be doubted whether, if the law were to be formulated today for the first time, the same principle would not apply as applies to other contracts; i. e., that the only breach which entitles the promisee to repudiate the whole contract is one which goes to the root of the venture. The Poznan, D.C., 276 F. 418, 431; Restatement of Contracts, §§ 274, 275. The law has not been so written, however, and certainly all but the most trivial deviations are considered gravely to affect the contract. How far they do affect it the courts are not in entire agreement; at times it has even been said that the shipowner converts the cargo (The Citta Di Messina, D.C., 169 F. 472, 475; Sidney Blumenthal & Co., Inc. v. United States, D. C., 21 F.2d 798) though we should hesitate to press the consequences so far. But it is settled that deviation strips the ship of all excuses in her charter-party, and imposes upon her at least the liability of a common carrier; i. e., of an insurer. The Willdomino, 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491; The Malcolm Baxter, Jr., 277 U.S. 323, 331, 48 S.Ct. 516, 72 L.Ed. 901.

■ That is quite enough in the case at bar to charge "Hain" even if the strand was not negligent. Hence the question arises whether "Farr's" inaction after discovering the deviation barred them from taking advantage of this default. A distinction must be made between suing for the damages arising from the deviation itself—e. g., for the resulting delay—and suing for a loss upon the theory that the contract has ended and the ship is liable as a common carrier. In the similar, though not identical, situation where the carrier has merely delayed delivery, the shipper does not lose his action for damages because he ships with knowledge of the delay. R. B. Boak & Co. v. United States Shipping Board, 5 Cir., 11 F.2d 523; Cohn v. United States Shipping Board, 6 Cir., 20 F.2d 56. We may assume arguendo that the same is true of deviations, though we can find no decisions in point. Again, it will not toll the shipper's privilege of treating the ship as an insurer, if he does not learn of the deviation until after the goods arrive and then accepts them. This was apparently the situation in The Pelotas, 5 Cir., 66 F. 2d 75 and The Henry W. Cramp, 3 Cir., 20 F.2d 320. But if he learns of a deviation while the voyage is in progress, and without protest or reservation of his rights, allows her to make good her fault, so far as she can, it is certainly inconsistent with fair dealing for him afterwards to assert that the remainder of the voyage was not performed under the charter, for that will be the owner's ordinary assumption. Nor is there authority lacking for this proposition besides the decision of the House of Lords in this very case; for the situation is one common enough in the law of contracts. "Farr" is asking to be freed from the limitations upon "Hain's" promise to carry the sugar, and in its place to substitute a duty imposed by law which "Hain" never assumed; to do so they must first wholly rid themselves of the contract in toto. In essence the situation is no different from other situations in which one party to a contract is privileged to declare it at an end and to pursue such remedies as the law raises in its place, e. g., the recovery of the consideration. It is well settled in such cases that the promisee will not free himself if, upon learning of the breach, he allows the promisor to go on with his performance without some warning that the contract is at an end. That is well settled in insurance. Oakes v. Manufacturers' F. & M. Ins. Co., 135 Mass. 248; Bennett v. Union Central L. Ins. Co., 203 Ill. 439, 447, 448, 67 N.E. 971. And also in building contracts. Dunn v. Steubing, 120 N.Y. 232, 24 N.E. 315; Schliess v. City of Grand Rapids, 131 Mich. 52, 62, 90 N.W. 700. The Restatement asserts it as a general proposition which it is. Restatement of Contracts, §§ 275, 276, 317. The right to damages is not affected by such conduct. Deeves & Son v. Manhattan L. Ins. Co.,

195 N.Y. 324, 88 N.E. 395. The district judge thought that the American maritime law as to deviation differed in this regard from that laid down in Tate & Lyle, Ltd. v. Hain S. S. Co., supra, but we can find no evidence of such a difference; the authorities on which he relies do not suggest that the shipper had learned of the deviation before the goods arrived, or were lost.

■ There remains the question whether the charter-party protected the "Tregenna," assuming that she negligently took the strand at San Pedro. "Farr's" argument as to this is that, although she was a private carrier—being chartered to a single shipper—and although for that reason "Hain" was free to exact such exceptions as it chose, an analysis of the charter-party as a whole shows that "Hain" was not to be free from liability for negligent navigation unless due diligence had been used to make the ship seaworthy in all respects. The charter, as already has appeared, contained an unconditional exception against negligent stranding; but later on it incorporated by reference the Harter Act, including of course § 3. From this "Farr" asks us to impose a limitation upon the earlier exception. The third section of the Harter Act confers an affirmative privilege upon the ship; she shall not be liable for negligence if her owners have been diligent to make her seaworthy; and it is true that in this charter such a privilege was probably redundant, though the words of the exception do not run quite pari passu with those of the section. This argument does not seem to us tenable. In the first place redundancy is not inconsistency—both provisions can stand; in the second, even if § 3 be redundant here, the charter-party was a form for use also for common carriers, and when so used, the incorporation of § 3 of the Harter Act would be extremely important. Besides, it is idle to invoke the canon against redundancy in the interpretation of such a maritime document as this. Courts have again and again observed the curious, often the fantastic, incongruities in charter-parties, bills of lading and insurance policies, composed, as they so often are, of a motley patchwork of verbiage thrown together apparently at random, often in an unfamiliar diction three hundred years old. Particularly in a document meant to do service in varying situations each word of such a discordant medley need not be made to count as we seek to make all the words count of carefully prepared contracts drawn for a particular occasion. True, in The Westmoreland, 2 Cir., 86 F.2d 96, the specific clause was typed in, which left no doubt that it should prevail; but interpretation is always a question of the ensemble, and when such a charter is used for a private carrier, we cannot doubt that the unconditional exception was meant to have the precise force of the words employed. We hold that the ship was excused, even though the strand was due to the master's negligence. That would not indeed have excused her for not having the latest charts of San Pedro—as she had not—if her unseaworthiness in that respect had caused the strand, but she went ashore upon some rock or shoal which the new charts showed as little as the old. Her unseaworthiness would have been relevant only if it had been necessary for her to resort to § 3 of the Harter Act. "Farr's" claim should have been denied and a decree entered for the freight due upon the voyage from San Pedro to Queenstown.

Decree reversed.