**WORLD WIDE STEAMSHIP CO., Inc., Plaintiff,**

v.

**INDIA SUPPLY MISSION and India Store Department, Defendants.**

**DIRECTOR OF the INDIA SUPPLY MIS-SION, for and on behalf of the President of India, Plaintiff,**

v.

**ORIENT MID-EAST LINES and Eagle Ocean Transport, Inc., Defendants.**

**Nos. 64 Ad. 50, 64 Ad. 464.**

United States District Court, S. D. New York.

Aug. 18, 1970.

Healy & Baillie, by Allan A. Baillie, New York City, for World Wide Steamship Co., Inc.

Baker, Nelson, Williams & Mitchell, by O. Taft Nelson, Robert M. Atkinson and Michael D. Martocci, New York City, for India Supply Mission, India Store Department, and Director of the India Supply Mission.

Haight, Gardner, Poor & Havens, by Wharton Poor and R. Glenn Bauer, New York City, for Orient Mid-East Lines and Eagle Ocean Transport, Inc.

CANNELLA, District Judge.

On September 30, 1961, the Liberian freighter S.S. Everest was time chartered (for a period of four to six months) by her owner, the World Wide Steamship Co., Inc. [hereinafter "World Wide"], to the Orient Mid-East Lines of Panama [hereinafter "Orient"]. Thereafter on October 6, 1961, Orient entered into a Baltimore berth grain charter party[1] with the India Supply Mission[2] calling for the Everest to transport some

---

1. World Wide Exhibit 7.

2. The Supply Mission, its Director, and the India Store Department will be referred to hereinafter as "India."

9,500 long tons[3] of rice from a United States Gulf port to Bombay.

The vessel departed Lake Charles, Louisiana on December 1, 1961, destined for Bombay via the Mediterranean and Suez Canal—the normal and shortest route between Gulf ports and India.[4] On December 15th, Orient instructed the Everest to put in at Las Palmas in the Canary Islands for fuel and then to proceed to Piraeus, Greece for additional cargo before continuing on to the Suez Canal.[5] The vessel's master, Ferendinos, immediately notified World Wide of these instructions.[6]

The Everest arrived at Piraeus on January 1, 1962 and the next day lifted some 35 tons of detonators, apparently consigned to the Punjab National Bank for the account of Indian Detonators, Ltd.,[7] and certain other miscellaneous cargo. The ship sailed for Port Said near midnight, January 3–4, and entered the Suez Canal on January 6th.

At approximately 3 a. m. on January 7th, while some 55 kilometers in the canal, the Everest encountered dense fog, whereupon the canal authorities ordered the vessel to moor. In maneuvering to make fast, the ship ran aground, forward on the starboard side, with the stern then drifting diagonally across the canal to port. Subsequent maneuvering to free the vessel and moor it on the port side of the channel resulted in damage to the rudder severe enough[8] to prevent the Everest from continuing the voyage to Bombay without first drydocking for repairs.

Following a survey conducted at the behest of World Wide, the detonators were off-loaded at Ismailia, and the Everest was towed back to Port Said where approximately half of the rice cargo was discharged to facilitate the dry-docking. The vessel was thereafter repaired, refloated, and reloaded with both the rice and detonators, and it finally arrived in India on or about February 11, 1962.[9]

World Wide filed its libel herein on January 20, 1964, seeking contribution to the general average[10] on the part of India. India in turn filed its libel against Orient and Orient's agent, Eagle Ocean Transport, Inc. The two actions were subsequently consolidated for trial.[11]

This Court's jurisdiction is based on 28 U.S.C. § 1333(1).[12]

The contentions of World Wide herein[13] are that expenses of a general average nature were incurred by it dur-

---

3. A subsequent addendum to the charter party stated that the Everest would actually lift 10019.2 long tons. See World Wide Exhibits 7A, 8.

4. Pre-Trial Order-World Wide Exhibit 1 [hereinafter "PTO"], p. 6.

5. See World Wide Exhibits 3, 12.

6. See World Wide Exhibits 2–pp. 13–14; 5; 12.

7. See World Wide Exhibit 4, India Exhibit G.

8. In attempting to continue down the canal after the fog had lifted, the Everest again ran aground due to a lack of adequate rudder control.

9. Prior to arrival in Bombay, a demand was made on behalf of World Wide for security for India's share of the general average expenses which had been incurred. India responded with a written undertaking that it would pay any such share it legally owed. See Exhibit B of PTO.

10. The amount sought from India is $45,185.70 plus interest from July 23, 1963.

11. The two issues as formulated in the Pre-Trial Order with respect to the second cause of action are contingent upon the outcome of World Wide's action against India. That is, if India is liable for general average contribution, is Orient liable to indemnify India for the amount of the contribution and/or liable to respond in damages to India for transportation of the cargo loaded at Piraeus? See PTO, pp. 3, 16–17.

12. Clause 35 of the charter party between India and Orient provided that all disputes arising thereunder be presented to this Court for determination.

13. Essentially similar contentions are made by Orient. Eagle Ocean Transport argues that it was a mere agent throughout the entire transaction. See generally PTO, pp. 9–11.

ing carriage of India's cargo; that the stopover at Piraeus did not constitute a "deviation", or, in the alternative, was reasonable and therefore not in breach of the Carriage of Goods by Sea Act [hereinafter "Cogsa"], 46 U.S.C. § 1300 et seq.; that if there was a deviation, India waived it; and that, in any event, the loss occurred after the deviation had ended and while the vessel was on course and the deviation had no causal relationship thereto.

India argues that the Everest's lifting of additional cargo at Piraeus amounted to an unreasonable deviation which India did not waive; that the deviation amounted to a breach of contract by Orient; that India therefore is not liable for general average contribution; but that, in the alternative, if India were to be held responsible for such contribution, India is entitled to indemnity from Orient and/or damages measured by the freight received for carriage of the detonators, to wit, $15,810.20.

\* \* \*

The court finds that the voyage to Bombay *via Piraeus* was clearly a deviation, which has been defined simply by Orient's counsel as a "departure from the ship's contractual course." [14] Steaming directly (and nonstop) from Gibralter to Port Said—a distance of approximately 1935 miles [15]—was the contractual course in this case. The deviation therefrom to Piraeus amounted to an additional 184 miles and a delay of at least three days in reaching the Suez Canal.

■ Both the voyage charter party and bill of lading were executed subject

to Cogsa, which provides, in pertinent part:

Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* that if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable. [16]

The court finds that the deviation to Piraeus was purely for the purpose of lifting additional cargo and therefore unreasonable within the meaning of the above section. See, e. g., United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833, 836 (S.D.N.Y.1965). Neither World Wide [17] nor Orient have sustained the carrier's burden of proving otherwise. See P & E Shipping Corp. v. Empresa Cubana Exportadora e Importadora de Alimentos, 335 F.2d 678, 680 (1st Cir. 1964); Surrendra (Overseas) Private Ltd. v. S.S. Hellenic Hero, 213 F.Supp. 97, 101 (S.D.N.Y.), aff'd, 324 F.2d 955 (2d Cir. 1963).

The court finds that there is a definite causal connection in this case between the deviation and the loss giving rise to the claim for contribution to the general average. Had the Everest not deviated to Piraeus, thereby delaying its arrival at the Suez Canal by some three days, the vessel would not have become fogbound and stranded, at least not when, where and how it did. [18] To quote from a translation of the master's re-

---

14. W. Poor, Charter Parties and Ocean Bills of Lading 195 (5th ed. 1968). See also Gilmore & Black, The Law of Admiralty § 3–40 (1957); Robinson, Admiralty Law in the United States 532 (1939).

15. PTO, p. 7.

16. 46 U.S.C. § 1304(4).

17. The court finds that World Wide was well aware of (and did not object to) the

deviation. Captain Ferendinos testified that he reported the Everest's "every move" to World Wide, including that ordered by Orient on December 15th. See Exhibit 2, pp. 13–14.

18. Presumably, another pilot, whose seamanship might have been less subject to challenge by the master, would have guided the Everest through the canal had she arrived a few days earlier.

port, offered into evidence by World Wide, "this misadventure * * * was due to an unprecedented misfortune. For a good six months there had not happened such a notably thick fog in the Suez Canal, besides this, we happened to be just opposite to [a] dredger and everything went very slow that night." World Wide Exhibit 9, pp. 15–16.

■ The court further finds that India was not aware of the deviation until some time after the stranding. World Wide and Orient argue, however, that the subsequent actions of India in allowing the voyage to continue and paying the freight, among others, amounted to a waiver, and they refer the court to Farr v. Hain S.S. Co., 121 F.2d 940 (2d Cir. 1941). In that case, Judge Hand set forth the apposite and very simple rule as follows:

> [If a shipper] learns of a deviation while the voyage is in progress, and without protest or reservation of his rights, allows [the ship] to make good her fault, so far as she can, it is certainly inconsistent with fair dealing for [the shipper] afterwards to assert that the remainder of the voyage was not performed under the charter * * * [T]he promisee will not free himself if, upon learning of the breach, he allows the promisor to go on with his performance without some warning that the contract is at an end. 121 F.2d at 944.

Both the Court in Farr and the House of Lords in the companion case of Tate & Lyle, Ltd. v. Hain Steamship Co., 155 L.T.R. 177 (1936), concluded that the deviation therein had been waived. In other words, the charterer had not complied with the above rule. But that is not the case here. India protested the deviation and objected to the reloading of the detonators.[19] Furthermore, India made clear its legal reservations in its undertaking to pay any general average share it might legally owe. Of course, it is usual to give such an undertaking in order to obtain the release of the cargo. But this arrangement does not prevent questioning the existence of a general average obligation. Globe & Rutgers Fire Insurance Co. v. United States, 105 F.2d 160, 163 (2d Cir. 1939).

■ This case boils down then to a question which seems to be one of first impression in this jurisdiction: Generally phrased, the issue is whether an unreasonable deviation can be a defense to a claim for general average contribution, or more specifically, whether a shipowner which is kept fully and continually apprised of the activities of its vessel under time charter is entitled to general average contribution from the cargo interest which neither knew of, nor acquiesced in, a deviation on the part of the time charterer, the deviation being causally connected to the loss sought to be averaged.

In Tate, the Court of Appeal had specifically answered the general formulation of the above issue, namely, an unjustifiable (unreasonable) deviation is a defense to a claim for general average contribution. 151 L.T.R. 249 (C.A. 1934). Lord Scrutton indicated that he was not aware of any case where a car-

---

19. Prior to the reloading, India's surveyor sent a warning [World Wide Exhibit 11] to Captain Ferendinos, stating, in part:
> * * * we have to strongly protest against reloading the * * * detonators, and hereby hold you responsible for the breach of the charter party agreement and for all consequences arising therefrom.

Judge Hand defined a deviation as "no more than a breach of the contract of carriage." Farr v. Hain S. S. Co., 121 F.2d 940, 944 (2d Cir. 1941). This court interprets the wording of the first clause of the voyage charter party herein, to wit, "a full and complete cargo * * * of rice," as meaning that India was the exclusive charterer. The loading of additional cargo at Piraeus was therefore a breach of the charter party, and the court is not persuaded that the deviation technically ended when the Everest entered the canal (i. e. was back on course) in view of the subsequent reloading and carriage of the detonators to India.

go owner had been held liable for general average contribution after an unjustifiable deviation. Nevertheless, the House of Lords overruled the Court by finding that there was "abundant, indeed conclusive evidence * * * that the deviation was waived by the charterers." 155 L.T.R. at 180. But, at the same time, Lord Atkin pointed out that:

> * * * one must be careful to see that the acts of the cargo owner are not misinterpreted when he finds that his goods have been taken off on a voyage to which he did not agree. He could not reasonably be expected to recall the goods when he discovers the ship at a port of call presumably still intending to reach her agreed port of destination. There must be acts which plainly show that the shipper intends to treat the contract as still binding.

No such acts are plainly shown in this case. India could hardly have been reasonably expected to refuse the reloading of her cargo, faced as she was at the time of the completion of the repairs to the Everest by the already considerable delay, coupled with the perishable nature of the cargo, questionable local storage facilities and an apparent pressing need for the rice, to begin with. Thus, the mere fact that India's full cargo was eventually delivered to Bombay is not conclusive in this case.

What is conclusive herein is that there was a causal connection between the unreasonable deviation and the casualty giving rise to the general average claim, that India did not waive this deviation, but rather protested it, and that the shipowner had notice of the deviation on the part of the time charterer. Under these circumstances, this court concludes that the deviation is a valid defense to World Wide's claim. To hold otherwise in this case would be to all but require every cargo owner to seek another ship for his cargo whenever the voyage of the original vessel has been interrupted by a casualty caused by an unreasonable deviation which the cargo owner chooses not to waive. World Wide's claim for general average contribution from India is therefore hereby dismissed.

In view of the above opinion, which represents the court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, and the contingency nature of India's libel against Orient et al., that libel is also hereby dismissed.

Settle order.