**HUFFMAN TOWING, INC., Plaintiff,**

v.

**MAINSTREAM SHIPYARD & SUPPLY, INC., Defendant.**

**No. GC 74-5-K.**

United States District Court,
N. D. Mississippi,
Greenville Division.

Jan. 27, 1975.

Frank S. Thackston, Jr., Greenville, Miss., for plaintiff.

Clayton J. Swank, III, Greenville, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

On January 11, 1974, Huffman Towing, Inc. (Huffman), a Missouri corporation, filed a complaint in admiralty against Mainstream Shipyard & Supply, Inc. (Mainstream), a Mississippi corporation, for the arrest of the M/V H. F. LEONARD (ex M/V HAVANA ZEPHYR). Huffman alleged that Mainstream's delay in performing a contract for repair of its towboat had caused Huffman to suffer substantial damages and had created a dispute over the charges owed Mainstream for the repair work. Upon posting bond for $340,000, Huffman gained possession of the arrested vessel. On January 18, Mainstream filed its answer denying breach of contract and counterclaiming for $336,037.79 as the balance owing by Huffman for repairs to the towboat. On January 21, Huffman admitted owing to Mainstream the sum of $282,670.59, which it paid into the registry of the court.[1] Huffman's bond was reduced to $65,000 pending the outcome of the dispute.[2]

In an evidentiary hearing, the court received stipulated facts, live testimony and documentary exhibits. The court now makes a merits determination, incorporating herein findings of fact and conclusions of law as required by Rule 52, F.R.Civ.P.

## I. FINDINGS OF FACT

During the early part of 1973, Huffman desired to repower the LEONARD and solicited bids from four shipyards, including Mainstream, whose proposal was accepted.[3] Mainstream's offer, as set forth in its letter dated March 23, proposed to repower the towboat for $294,000, stating "the work can be scheduled for July 1, 1973, and should require about 60 days to complete."[4] Huffman on April 27 accepted the offer in writing and tendered Mainstream the specified downpayment of $60,000.

The time of completion expressed in the contract—"about sixty days" from July 1—was a material and important consideration to Huffman in deciding to accept Mainstream's offer; and at all pertinent times Mainstream knew of the importance of time because of the vessel's potentiality for earning revenues when placed in service. The undisputed evidence reveals that the work could reasonably have been accomplished by Mainstream within 60 days from commencement or by September 1.

Huffman delivered the vessel to Mainstream's yards at Greenville, Mississippi, about June 22. At the time of delivery, and even prior thereto, Huffman contemplated that Mainstream would do certain additional work, over and beyond the items specified in the repowering contract, while the vessel was at Main-

---

1. Huffman tendered to the Court Clerk its certified check for the stated amount drawn on a St. Louis bank; the Clerk deposited the check in the court's registry account on January 29; on the next day Mainstream received payment from the Clerk, and claims interest on the payment until the certified check was presented for payment.

2. By an amended complaint, Huffman increased its claim for damages for delay to $78,800. Other claims made in the amended complaint relating to items of allegedly defective gear boxes and engine realignment are reserved for separate trial under Rule 42(b), F.R.Civ.P., in accordance with the court's pretrial ruling.

3. Other bid proposals for the repowering work were received from (a) Lemont Shipbuilding and Repair Company for $356,000, with no completion time specified; (b) St. Louis Shipyard for $334,000, providing 90 days from date of acceptance to obtain the required engines, etc., with job to be completed within 4 to 5 weeks after receipt of engines and gear at the shipyard; and (c) National Marine Service for $284,995, with no completion time specified.

4. Mainstream's proposal as submitted to Huffman contained a handwritten notation that new E2 power packs, rather than rebuilt packs, would be used in the engines supplied by Mainstream.

stream's shipyard; and Huffman anticipated that the extra items authorized by it would be done by Mainstream on a time and materials basis and without a fixed time of completion. The cost of these extra repairs authorized by Huffman while the vessel was at Mainstream's shipyard was, excluding sale of parts only, about $82,000. It is stipulated that after crediting Huffman with payments of $342,670.59, a balance of $52,653.13 is owed Mainstream, subject to Huffman's offset for damages, if any.

The parties' plans went awry, however, and the contract work, with all extra items ordered by Huffman, was not completed until January 9, 1974, or some 130 days after the original September 1 deadline. The contract work, beyond removing the engines from the LEONARD, was delayed for several weeks beyond July 1. Mainstream attributed this initial delay to the fact that its engine repair shop had become flooded when the Mississippi River rose above 50 feet on the Greenville stage, a condition which first occurred on March 27 and continued to June 1. As a consequence, Mainstream was unable to do comparable engine work on other towboats for which Mainstream had contracted prior to making the Huffman contract. Mainstream was, of course, fully aware of the flooded condition and other work commitments when it submitted the Huffman proposal and it at no time prior to acceptance sought to qualify the contract or extend the time for completion.

Huffman assigned its port engineer, Wayne Morris, to supervise the contract work, keep up with its progress, and determine what additional repairs should be made by Mainstream. About July 24, Morris first realized that Mainstream would be unable to complete the contract work by September 1 and so advised his superiors. Huffman made no move to rescind the contract because of delay, and allowed Mainstream to proceed in performing the contract work. Had Huffman rescinded the contract in July or August, it would have been confront-

ed with the likelihood of greater costs from another shipyard and still greater delays in readying the LEONARD for service. It is apparent that Huffman minimized the amount of its actual damages by allowing the LEONARD to remain at Mainstream's shipyard for repairs.

Morris emphasized to John Sansing, Mainstream's manager, that Huffman was anxious to have the contract work completed as soon as possible and consistently stressed the importance of time. Even so, Mainstream's progress on the contract work was slow, and continued at substantially less than its efficient capability until the latter part of September. During this time interval, Mainstream was proceeding with two other repowering jobs, accepted incoming new repair jobs, and had other crews engaged in constructing new vessels. As a consequence, in many work weeks Mainstream devoted less than one-third of its potential manpower capacity to the contract work on the LEONARD. Sansing conceded that at least thirty days' delay in performing the Huffman contract was caused by work done on other vessels.

On various occasions between July and December Morris requested Sansing to perform extra work on the LEONARD; these requests were usually made orally and handled informally. Morris stated that he did not want the extra work to delay the job, but when Morris' requests involved the employment of the same crafts as were engaged in the contract work—such as electricians, fitters, welders, and engine mechanics—Sansing advised Morris of the difficulties because of limited manpower available. Notwithstanding this, Morris issued extra work orders. Morris also knew that certain extra items which Sansing agreed to perform, but without specifying a date for completion, would, to some extent, likely delay completion of the contract work. The time expended on the contract work amounted to 4800 man hours, while the extra work items required 4300 man hours. Frequently, the

same crafts worked aboard the LEONARD performing contract work or extra work, depending upon the exigencies of a given work day. Huffman made no written protest of the delay until October 31, when it demanded completion by November 15.

Despite Morris' claims to the contrary, some of the extra items ordered by him did delay performance of the contract work. Morris testified to the effect that the aggregate of the extra items took about five weeks to accomplish, but he maintained they could have been completed within the original contract period. Morris' testimony is sharply disputed by Sansing and Allen Mott, Mainstream's vice-president. Mott was of the view that the extra work necessarily delayed contract performance from 8 to 10 weeks, while Sansing's estimate of such delay was from 6 to 8 weeks. From this conflicting evidence, the court finds that the contract performance was reasonably delayed 56 days, or eight weeks, because of the extra work ordered by Huffman.[5] Thus, it is fair and reasonable to apportion the 130-day delay in contract performance between the parties by attributing 74 days of the time overrun to Mainstream

under the contract and 56 days to Huffman because of the extra work.

During the fall months of 1973, market conditions for employing a towboat of the type of the M/V H. F. LEONARD were favorable, and a steady demand existed for such vessels with capacity to tow barges on the inland waterways. The LEONARD, if it had been ready for service on September 2, could have been profitably used by Huffman. Substantial evidence establishes that the towboat could have been chartered for $1,600 per day, plus cost of fuel, and the vessel had a net daily revenue earning capacity of $330.41, exclusive of depreciation and fixed overhead expenses. In addition, Huffman incurred a daily charge of $44.07 for "port risk" insurance, a cost which would have been avoided had the LEONARD been in service.[6]

## II. CONCLUSIONS OF LAW

■■ Huffman's basic contention is that the contractual provision that "work can be scheduled for July 1, 1973, and should require about 60 days to complete," is a sufficiently definite requirement as to time of performance to be binding and enforceable against

---

5. This calculation of time for extra work is made by allowing 14 days for essential underwater work to the shaft and rudders, 5 days for painting and sandblasting of the hull, 21 days for enlarging the fuel tanks, and 16 days for various other items, including continuous electrical and pipe work of an extensive nature, and loss of time incident to transfer of work crews from contract work to extra work. Although Huffman authorized the underwater work in July, it did not request the fuel tank work until December. Morris conceded, reluctantly, that the underwater and fuel tank work, taken together, would cause a 16-day delay, but he was unwilling to acknowledge his actions accounted for further delay.

6. Other elements of damage for down-time contended for by Huffman but which the court rejects are:

(1) $37.35 per day subsistence for Wayne Morris and his crew while stationed at Greenville. This item is disallowed because LEONARD'S crew, employed by Huffman to do other work, could have lived aboard the

vessel the entire time of repair except for the extra work to the galley and boat interior ordered by Huffman.

(2) Interest at $14 per day on the $60,000 downpayment, which sum Huffman temporarily borrowed from its bank. This claim is denied because upon completion of repairs, Huffman executed a long-term ship mortgage against the vessel in a gross sum covering all repairs. Huffman thus was at all times financing the cost of LEONARD'S repairs. The interest on the greater sum is, of course, deducted as an operating expense to arrive at the net revenue earning figure of $330.41.

(3) $80.56 per day attributed to labor increase. This item is rejected as wholly speculative and also duplicative of labor costs included in the operating expenses deducted in order to arrive at net revenue earning capacity.

(4) 1% per month for "inflation". This item is not only speculative but incomprehensible because the 1% appears to be calculated against an unknown factor.

Mainstream, for the breach of which a claim for damages arises. We agree. It is, of course, elemental that any ambiguity in the writing should be construed against Mainstream, the drafter of the instrument. The critical words in the document, "should", denoting obligation, and "about", signifying no more than reasonable deviation in the period of time, reasonably convey an intent of a binding undertaking with respect to time. This interpretation is corroborated by undisputed proof that both of the contracting parties entered into the agreement with knowledge of time's importance, and Mainstream fully intended to be bound by the expressed promise as to time of performance.[7] See 1 Williston on Contracts, 3rd Ed., § 40 at 126. Mainstream also conceded that 60 days after commencement of the job was a reasonable time within which to complete the contract. Mainstream does not seriously contest the basic legal principles advanced by Huffman, but asserts that it nevertheless has alternative defenses, as follows:

(a) The flooding of Mainstream's engine shops for two months, as a matter of law, extended the time for performance, or excused Mainstream from complying with the promise to complete the contract by September 1.

(b) Huffman waived the time clause in the contract by acquiescing in the delay and allowing Mainstream to complete the contract.

(c) Huffman waived the time clause in the contract by requesting Mainstream to perform extra work.

(d) Since the total delay was attributable in part to Mainstream and in part to Huffman, no apportionment of delay between the parties is factually or legally permissible, thus precluding Huffman from claiming any damages.

(e) The evidence fails to show that Huffman suffered losses which are legally recoverable.

Finding that Mainstream's contentions are without merit, the court will now discuss each of them.

■ (a) It is well settled that a contract to repair a vessel is maritime, that principles of admiralty govern the rights of a shipowner, and that the terms of the repair contract are construed in accordance with federal law. North Pacific Steamship Co. v. Hall Bros. M. R. & S. Co., 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919); Alcoa Steamship Co. v. Charles Ferran & Co., 383 F.2d 46 (5 Cir. 1967); Sicula Oceanica S. A. v. Wilmar Marine Eng. & Sales Corp., 413 F.2d 1332 (5 Cir. 1969). In *Sicula Oceanica*, the Fifth Circuit applied to a maritime contract the general principle of contract law that a supervening discovery of facts that makes the promised performance more difficult, or the occurrence of subsequent events having this effect, if they are such as to be commonly foreseeable and in contemplation, usually does not discharge the contractor from his duty. A corollary rule is that an act of God which renders performance more difficult but not impossible does not excuse the contractor from his unconditional promise. Jones v. United States, 96 U.S. 24, 24 L.Ed. 644 (1878); 1 Am.Jur.2d, Act of God, § 13, p. 684. What Mainstream now characterizes as supervening occurrences (the flooding of its engine shop and other major contract work antedating the Huffman proposal) were clearly evident to Mainstream when it made the offer and continued to be apparent until the moment of Huffman's acceptance. Yet, Mainstream failed to insert in its offer any clause for an extension in any eventuality. The flood therefore cannot be a legally acceptable reason for delay. In any case, it was not impossible, by any means, for Mainstream to finish the contract by September 1. The scheduling of other work, rather than spring flooding, was the basic cause of delay, and surely Mainstream cannot be heard

---

7. Mainstream's argument that the contract does not make "time of the essence" is irrelevant since Huffman does not here seek to be relieved of an obligation to pay the contract price, but to collect damages for the delay in a fully executed contract. See 6 Williston on Contracts, 3rd Ed. § 846.

to contend that its own excessive contracting practices constitute a legal defense to performance of those contracts. Thus, Mainstream's assertion that it should be excused from the time clause because of an act of God or other work difficulties is wholly untenable.

(b) When Huffman realized that the contract would not be performed on time and acquiesced in Mainstream's continuing the work, Huffman, of course, waived the right to rescind the contract, but it did not waive a right of action for damages for the delay resulting from Mainstream's breach of contract. R. B. Boak & Co. v. U. S. Shipping Board, 11 F.2d 523 (5 Cir. 1926); Farr v. Hain S. S. Co., 121 F.2d 940 (2 Cir. 1941); Robberson Steel Co. v. Harrell, 177 F.2d 12 (10 Cir. 1949). As the Tenth Circuit succinctly stated in *Harrell*:

"[T]he prevailing rule of wide acceptation with which we find ourselves in accord is that while acceptance of performance after breach may operate as a waiver of the right to treat the contract as terminated by the breach, such acceptance standing alone and without more does not constitute an effective waiver of the right of action for damages caused by the breach." 177 F.2d at 16.

The principal cases relied upon by Mainstream, Oklahoma State Fair Exposition v. Lippett Bros., Inc., 243 F.2d 290, 292 (10 Cir. 1957) (construing Oklahoma law), and Glen Cove Marina, Inc. v. Vessel Little Jennie, 269 F.Supp. 877 (E.D.N.Y.1967) (applying maritime law), are fully supportive of the foregoing principle.[8]

In the case sub judice, there was no agreement, express or implied, to extend the time for performing the contract work, and Huffman's acquiescence, which operated to minimize its damages,

did not constitute an abandonment of Mainstream's obligation to finish the contract work on time. Thus, Mainstream's argument that the time clause was waived by Huffman's acquiescence is rejected.

(c) The written contract contained no clause allowing for extra work, nor any provision to extend the time of performance in that eventuality. Yet the parties, at all times, did contemplate that extra work would be done. The evidence shows without dispute that Huffman, when authorizing the additional repairs, did not intend to abandon the September 1 completion date for the contract work; and Mainstream, in accepting requests for the extra work, clearly understood the shipowner's intention. Given these circumstances, we hold that the ordering of extra work, per se, did not constitute an abandonment by Huffman of the fixed date for completing the original work. To establish a complete waiver, Mainstream would have to show that the shipowner's act of ordering any extra repairs, regardless of their nature, inevitably prevented the contractor from timely performance, a burden which Mainstream has utterly failed to carry. 13 Am.Jur.2d, Building, etc. Contracts, § 48 at 51. Of course, to the extent that extra work necessarily delayed the contract performance, the time for completion was extended.

(d) The central question in this case, as perceived by us, is raised by Mainstream's argument that since both parties contributed to the delay—Mainstream by not completing the contract work on schedule, and Huffman by ordering certain extra items which did necessarily take additional time—no apportionment of the delay is permissible, thus defeating the shipowner's claim for damages. This court has carefully considered this issue, bearing in mind that

8. The court, in Glen Cove Marina, Inc., stated:

"Even though a court finds that a party's delay in performance should not deprive him of his rights under the contract, he may still be required to compensate the other party for damages suffered as a result of the delay." 269 F.Supp. at 880. See 17 Am.Jur.2d, Contracts, § 388, p. 833.

the majority rule, which is adhered to by the United States Supreme Court, precludes an apportionment of delay between the parties where the contract expressly provides for liquidated damages in event of delay. See Anno. 152 ALR 1359 et seq. The leading case supporting the majority rule is United States v. United Engineering & Contracting Co., 234 U.S. 236, 34 S.Ct. 843, 58 L.Ed. 1294 (1914). There *United Engineering* entered into a contract with the government to build a drydock. The contract called for completion within seven calendar months, with a provision that the contractor pay damages at a fixed rate of $25 a day for delay. Two supplemental contracts extended the delivery date for six months, with the work being actually completed and accepted three and one-half years after the extended delivery date. It was factually determined that 240 days out of the three and one-half years' delay were attributable to the contractor and the remainder to the government. The government withheld $6,000 or $25 per day for 240 days from its final payment, claiming that it was entitled to such apportionment. Rejecting this contention, the Supreme Court held that the contractual stipulation for liquidated damages was waived by the government's conduct. Nevertheless, the Court clearly recognized that its holding did not preclude the government from recovering actual damages for the delay chargeable to the contractor. The Court emphasized that:

"The rule of the original contract cannot be insisted upon, and liquidated damages measured thereby are waived. . . . Under such circumstances we think it [the government] must be content to recover such damages *as it is able to prove were actually suffered.*" (Our emphasis). 234 U.S. at 242, 34 S.Ct. at 845.

Reiterating that the government was not barred from recovering actual as distinguished from liquidated damages, the Court stated:

"This principle [against apportionment] is applicable here; the conduct of the government's agents had caused the delays up to May 1, 1913, and the subsequent delays, though chargeable to the claimant, would only give rise to a claim for damages measured *by the actual loss sustained.*" (Our emphasis). 234 U.S. at 243, 34 S.Ct. at 846.

In a recent decision, Acme Process Equipment Co. v. United States, 347 F. 2d 509, 171 Ct.Cl. 324 (1965), the Court of Claims had occasion to analyze the rationale of United States v. United Engineering & Contracting Co. While refusing to make an apportionment for delays in a contract providing for stipulated damages where the delay was caused by both parties, the Court emphasized that the rule of law was limited to a denial of liquidated damages and not actual damages. The Court stated in relevant part:

"It [the rule against apportionment] does not deprive the Government of an opportunity to prove and recover its actual damages caused by the contractor's delay; instead, the defendant merely loses its right to insist on an artificial measure of damages agreed on by the parties for the situation in which the contractor alone is responsible for the delay." 347 F. 2d at 535.

The rule, of course, allows no recovery to the owner where he sustains no actual damages from the contractor's delay. Massman Construction Co. v. City Council of Greenville, 147 F.2d 925 (5 Cir. 1945).

In the case sub judice, the contract has no provision for liquidated damages, and we are not called upon to apply the majority rule respecting nonapportionment which we would unhesitatingly follow, if applicable here. Instead, Huffman claims actual damages for delay supported by credible evidence, and not a sum of money specified as damages in the contract. We agree with Huffman's position that although an owner is responsible for part of the total time delay beyond the contract deadline, it may re-

cover its actual damages for that proportion of the total delay for which the contractor, rather than itself, is responsible. Mainstream citing no persuasive authority to the contrary, we hold that, as a matter of law, the delay in this case is susceptible of apportionment. We also find from substantial evidence that the amount of delay chargeable to each party has been reasonably shown, thus enabling the court fairly to charge both the shipowner and the contractor with the amount of delay attributable to each. Surely, Mainstream cannot complain if it is credited with that portion of the delay which its own proof discloses, with reasonable certainty, was caused by Huffman's acts. Conversely, Huffman, which urges a proper apportionment, is justly treated by charging Mainstream with all delay except that portion which was caused by the shipowner's act. Using this rationale, the court apportions to Mainstream 74 days delay and to Huffman 56 days delay.[9]

■ (e) Mainstream's last contention is that Huffman at all events must be denied recovery because of failure to prove actual damages. The principal item of damage asserted by the shipowner was for the loss of revenue sustained while the LEONARD was detained by Mainstream and out of service. Huffman was engaged in an established business of operating and chartering towboats and barges, having a fleet of four towboats, including the LEONARD, which it had owned and operated for 20 years. As heretofore found, Huffman showed, with reasonable certainty, that the daily charter rate for the vessel was $1,600, exclusive of fuel; after deducting the ordinary operating expenses from the gross fee, the vessel's daily net revenue capacity was $330.41. These calculations were based on Huffman's operating experience with the LEONARD after it was returned to service. Huffman's approach is, we think, the proper measurement for the net income lost during the period of detention by the contractor. Delta Marine Drilling Co. v. M/V Baroid Ranger, 454 F.2d 128 (5 Cir. 1972); Ove Skou v. United States, 1973 A.M.C. 1482, 478 F.2d 343 (5 Cir. 1973).[10] Mainstream nevertheless asserts that Huffman has failed to carry the burden of showing actual damages. The principal thrust of its argument is two-fold: first, that the work contemplated by the repowering contract alone would not render the LEONARD operable. This contention is refuted by evidence that none of the extra work, other than the underwater repairs, was essential to the vessel's operation, the remaining extras being only to improve an otherwise operable vessel. Second,

---

9. The same result obtains whether Huffman ordered the additional work in July or December, or at any time in between.

10. Judge Wisdom, writing for the Court, in OVE SKOU:
   " 'If the vessel is under charter and if off-hire as a result of the collision, damage to the owner can be computed by calculating the lost charter hire and deducting any savings to the owner attributable to the ship's being out of service. In other words, the ordinary operating expenses can be deducted from the charter hire and out of pocket expenses during the layup added in when arriving at proper damages.' BUE, at 917; Moore McCormack Lines v. Esso Camden, 2 Cir., 1957, [1957 A.M.C. 971,] 244 F.2d 198; Hygrade NO. 24 v. Dynamic, 2 Cir. 1956, [1956 A.M.C. 1032,] 233 F.2d 444. Where the shipowner makes no savings of operating expenses during repairs the charter price is an adequate measure of damage.' "
   "The general measure of the economic loss of a vessel during detention is net profit. The contract rate for rental of the vessel is a proper guide for measuring the lost income of the shipowner. Delta Marine Drilling Co. v. M/V Baroid Ranger, 5 Cir. 1972, [1972 A.M.C. 312,] 454 F.2d 128. From a gross charter price must be subtracted the ordinary expenses the shipowner would incur in earning that gross fee. Steamboat Potomac v. Cannon; Umbria, 1897, 166 U.S. 404, 421, 17 S.Ct. 610, 617, 41 L.Ed. 1053. The burden is upon the shipowner to prove the extent of damages actually sustained by him. Steamboat Potomac, 105 U.S. at 630 [26 L.Ed. 1194]; BUE, Admiralty Law in the Fifth Circuit—II, 5 Houst.L.Rev. 772, 915–20 (1968)."

Mainstream asserts that the sum of $330.41 cannot stand as the net daily revenue earning capacity of the LEONARD because that figure does not include deductions for the vessel's depreciation or for Huffman's administrative overhead. Admittedly, if depreciation to the LEONARD were deducted as an operating expense, the daily net earning would be reduced to $142.61; and while Huffman's overhead expense is not disclosed, the probability is that if a portion thereof were allocated to the LEONARD, the lost profits would be substantially reduced, possibly to a zero figure. Thus, Mainstream asserts vigorously that in a computation of profits in this case all expenses of every kind must be deducted, in accordance with generally accepted principles of accounting.

■ Although there is a split of opinion among the courts as to whether fixed expenses are excludible by a plaintiff in computing loss of profits, the better view, in our opinion, is that overhead or fixed expenses, which are not affected by a breach of contract, should not be deducted in calculating the lost profits attributable to the breach. This is so because such expenses remain constant, irrespective of the breach, and nonperformance of the contract produces no overhead cost savings. Vitex Mfg. Corp. v. Caribtex Corp., 377 F.2d 795, 798 (3 Cir. 1967); Buono Sales, Inc. v. Chrysler Motors Corp., 449 F.2d 715 (3 Cir. 1971); Restatement, Contracts, § 329. See Anno. 3 ALR 3d 689, 697–704, collating cases expressing both views, and n.16 at page 697. The Uniform Commercial Code is supportive of our position. Miss.Code Ann. § 75–2–708(2) (1972). We have no difficulty in holding that Huffman properly excluded overhead expenses in its computation of lost profits. We place depreciation on a towboat in the same class as a fixed overhead expense because it, too, accrues at a constant rate, regardless of whether the boat is operated or not.[11] In addition to the clearly established daily loss of profits of $330.41, Huffman incurred a direct expense for "port risk" insurance of $44.07 during the period of the vessel's detention by Mainstream.

■ We, therefore, hold that Huffman has a valid offset of $27,711.52,[12] against Mainstream's admitted balance of $52,653.13, leaving $24,941.61 owing to Mainstream. This sum should bear interest at the rate of 6% per annum from January 10, 1974, or the day following the date of completion of all repairs. Prejudgment interest, accrued to date in the amount of $1,571.32, is properly allowable in admiralty, if not as a matter of right in contract claims, 3 Benedict on Admiralty (6th Ed.) § 419, certainly at the discretion of this court. Sinclair Refining Co. v. S. S. Green Island, 426 F.2d 260 (5 Cir. 260); Petition of Canal Barge Co., 323 F.Supp. 805, 823 (N.D.Miss.1971), modified 480 F.2d 11 (5 Cir. 1973). In addition, Mainstream is due interest of $518.21 for a delay in payment of 11 days, or from January 10 to January 21, of Huffman's admitted obligation of $282,670.59.

■ Mainstream asserts it is also due interest on this admitted obligation from date of deposit with Clerk on January 21 until January 29. (n.1). A lapse of nine days occurred before the check, the certification of which. was procured by Huffman on its bank of account, was deposited by the court Clerk in the court's registry account. We disagree that the sum represented by the

---

11. As James B. Young, certified public accountant, testified, a towboat comparable to the LEONARD has a useful life of 16 to 18 years, and on which depreciation is taken at a constant rate over the entire period. Although Young admitted that depreciation is a deductible expense under generally accepted accounting principles, he also stated that it should not be considered in determining the true net loss to Huffman.

12. This consists of 74 days unexcused delay at $330.41 per day, totaling $24,450.34, and 74 days of port risk insurance cost at $44.07 per day, totaling $3,261.18.

check continued to bear interest until it was paid. Granted that Huffman, as the drawer, was not discharged until the certified check was paid, nevertheless, the check was negotiated by delivery to the Clerk, the named payee, and this had the effect of suspending the underlying obligation of Huffman, pro tanto, until the instrument was presented for payment. Uniform Commercial Code § 3–202(1), 3–802(1)(b); 60 Am.Jur.2d, Payment, § 45. Thus, interest claimed by Mainstream would be owing only if the check had been dishonored when presented for payment.

Accordingly, let a decree be entered in favor of Mainstream against Huffman and the surety on its bond.