**ARUNDEL CORPORATION, as owner of THE SCOW A–65, Libelant,**

**v.**

**THE CITY OF CALCUTTA, her engines and tackle, etc., and Ellerman Lines, Ltd., Claimant, Respondents.**

**No. 20232.**

United States District Court
E. D. New York.

Oct. 27, 1958.

594

Foley & Martin, New York City, for libelant, Arundel Corp. Christopher E. Heckman, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for respondents The S.S. City of Calcutta and Ellerman Lines, Ltd. Edward L. Smith, James Proud, New York City, of Counsel.

MOORE, Circuit Judge (sitting by designation).

The Arundel Corporation, as owner of the scow A–65, filed a libel against the S.S. City of Calcutta (referred to as Calcutta), claiming damages to the A–65 which sank after colliding with the Calcutta which was anchored in the main channel of Lower New York Bay. Ellerman Lines, Ltd. answered the libel as claimant of the ship.

The accident occurred in the early morning of May 15, 1953 in the Lower Bay, south-southeast of buoy 19–A, commonly called Craven Shoal Buoy. The Arundel tug, Brooklyn, a large (142 feet long), powerful (1,200 horsepower) vessel capable of making twelve knots without a tow, and three knots with the heavy tow she had at the time of the accident, was proceeding out of the harbor heading for a dumping ground at sea. It had a two of three scows in tandem, all of which were loaded, and the last of which was the A–65. The scows were closed together, and a hawser 300 feet long ran from the tug to a bridle on the first scow. The total distance from the tug's stern to the A–65's stern was 735 feet.

On the evening of May 14, the Calcutta, also outbound, was forced by heavy fog to anchor about a mile and a half south of the Narrows. Anchorage 28, the northeast corner of which is marked by Craven Shoal Buoy, was too shallow for her 25-foot draft. A sudden and dense fog forced the ship to drop her anchor in the navigable waters of the harbor.

I. Anchoring of the Calcutta

The Anchorage Regulations for the Port of New York (Exh. 1), (issued pursuant to 33 U.S.C.A. §§ 180, 258,

318, 471) provide (33 CFR § 202.155 (*l*) (1)):

"Except in cases of great emergency, no vessel shall be anchored in the navigable waters of the Port of New York outside of the anchorage areas established in this section, * * *."

Four factors influenced the Calcutta to anchor in the channel: (1) the denseness of the fog; (2) her draft compared with the depth of the anchorage waters; (3) anchor bells sounding from Craven Shoal Anchorage to the west and Gravesend Anchorage to the east; and (4) the anchoring of the vessel proceeding out of the harbor directly ahead of the Calcutta.

█ Under these circumstances the dropping of the anchor was a proper emergency precaution. For libelant, therefore, to succeed in this action it must be shown that the Calcutta was at fault in failing to get under way and move from its location prior to the collision.

## II.   Remaining in the Channel

Section 202.155 (1) (6) of the Anchorage Regulations for the Port of New York provides that:

"Any vessel anchoring under circumstances of great emergency outside of the anchorage areas * * * shall move away immediately after the emergency ceases, * * *."

Respondent admits, as he must, that "There is no dispute that both case law and the regulations require a vessel anchored in a fairway to move as soon as the vessel can safely do so", but argues that the fog had not lifted so as to give the Calcutta time to get under way prior to the collision.

█ According to the testimony of the Brooklyn's navigator given at the Coast Guard investigation, visibility was "not much over a mile" and the weather was rainy and "misty". Throughout the early morning hours of May 15 the fog had been alternatively lifting and then setting in again. The fact that there had been some traffic, most notably tugs with short tows, prior to the collision does not mean that the Calcutta was obligated to get under way immediately. The decision to venture into a dark, murky night with the possibility of re-encountering a thick fog would vary with the type of vessel, and the factors which might seem trivial to the master of a tug might be crucial in the deliberations of the master of a large, deep draft freighter. That other vessels of presumably shallower draft than the Calcutta had not yet abandoned Anchorage 28 is some indication that the reluctance of the master of the Calcutta to get under way was not ill-advised. While the issue is close, a certain latitude of judgment must be given to the master under all the existing circumstances.

█ Upon all the facts it cannot be said that the Calcutta was at fault for not moving from its temporary anchorage prior to the collision. However, it is not necessary to come to a definite conclusion that the Calcutta was or was not at fault in failing to get under way because the facts surrounding the collision still would not support a decree against the vessel.

## III.   The Cause of the Collision

Turning now to the accident, two or three ships were at anchor to the west and south of Craven Shoal Buoy. The Brooklyn was outward bound by way of Swash and South Channels as dump tows are forbidden from using Ambrose Channel. She had intended to pass buoy 19–A on her port side, but on seeing anchorage lights and hearing bells from vessels anchored at the westward part of Craven Shoal Anchorage 28 (U.S.C. & G.S. Chart No. 369) she did not follow the customary route used by tugs towing dump scows but altered her original course so as to pass to the east of the buoy. After passing the buoy she cut back to the west in an attempt to clear the Calcutta.

At 2:10 A.M., the time of the accident, the tide was ebbing in a direction of about 150°T at approximately its

maximum velocity of two and a half knots, giving the tug a speed of advance of about five and a half knots. After it passed the buoy, the tug changed its course to the west in an effort to pass between the anchorage and the Calcutta. The strong ebb tide caused the tail of the tow to drift toward the Calcutta. The navigator of the Brooklyn then brought the tug hard to port in order to whip the scows out of the way. The first two scows cleared but the A–65 struck the anchor chain of the Calcutta, then the Calcutta itself and shortly thereafter sank.

There is no dispute that the Brooklyn saw the Calcutta at anchor long before the Brooklyn reached buoy 19–A. Therefore a decision had to be made as to whether to round the buoy and head in a westerly direction or continue south and pass to the east of the Calcutta. Although it is not the function of the court, particularly with the benefit of hindsight, to indicate how in its opinion the accident might have been avoided, it must weigh the facts as they existed at the time.

By the admission of the Brooklyn's navigator, there was no traffic to the east of the Brooklyn, and no northbound traffic. By holding to his southeasterly course after passing the buoy for at most a few more minutes, and then heading south for Swash Channel, the navigator would not have had to chance the current's setting his tow down onto the Calcutta, and he could have avoided the mouth of Ambrose Channel. The reason given for passing west of the Calcutta was a reluctance to take the tow into waters which were on a line with Ambrose Channel. While there is a port regulation prohibiting such tows from interfering with the entrance to Ambrose Channel, passing to the east

of the Calcutta would not have blocked the Channel if the Calcutta was actually in the position stated by the Brooklyn's navigator. Nor would any interference with shipping have resulted because there was no movement in the Channel. The most reasonable inference is that the Brooklyn's navigator, in attempting to take the tow to the west of the anchored vessel, may have misjudged the velocity of the current. Even after the accident the navigator was under the impression that the current was only one and a half knots, not its actual speed of two and a half knots.

On the other hand, if the position of the Calcutta, as determined by the anchor bearings of her second officer, viz. 800 yards down from the buoy, is accepted, then the Brooklyn either did not pass the buoy close aboard to starboard or did not begin to haul over to the west until it was within three or four hundred yards of the Calcutta.

Even if the Calcutta were found to be remiss in not moving, no liability can attach to her since under the doctrine of the last clear chance the Brooklyn was solely responsible for the loss of the scow.[1] Taking the navigator's own testimony, he first saw the Calcutta when he was a mile above Craven Shoal Buoy, or more than ten minutes before he was abreast of the buoy. Assuming both vessels to have been at fault, the Brooklyn was the only one which was under way and which could maneuver. Her navigator conceded that upon sighting the lights of the Calcutta he realized that she was anchored and stationary. Therefore he knew that the responsibility for avoiding the Calcutta rested solely with him. He thus had ample time to become apprised of the situation and to decide upon the proper course for avoiding the Calcutta.

---

1. While this doctrine is sometimes said not to be applicable in admiralty, see, e. g., Williamson v. The Carolina, D.C. E.D.N.C.1958, 158 F.Supp. 417; Black & Gilmore, The Law of Admiralty, p. 404 (1957), it is clear that it does apply at least in this circuit as well as in the Third and Fifth Circuits. The Sanday, 2 Cir., 1941, 122 F.2d 325; The Cornelius Vanderbilt, 2 Cir., 1941, 120 F.2d 766; P. Dougherty Co. v. United States, 3 Cir., 1953, 207 F.2d 626; Crawford v. Indian Towing Co., 5 Cir., 1957, 240 F.2d 308.

He had the clearly presented choice of adding a few minutes onto his voyage by passing to the east of the Calcutta but thereby obviating the risk of collision, or taking the quickest route to his destination and running the risk of having the current set his tow down onto the Calcutta. He elected to take the westerly course and cannot now shift responsibility for the consequences of that decision onto the Calcutta. The same conclusion was reached in The Perseverance, 2 Cir., 1933, 63 F.2d 788, where a tug with a tow was held solely responsible for a collision of its tow with a steamer improperly anchored in a fairway.

The foregoing opinion constitutes the findings of fact and conclusions of law required by Admiralty Rule 46½, 28 U.S.C.A.

The libel is dismissed.