ARKANSAS VALLEY DREDGING COMPANY, INC., Plaintiff,

v.

MAGNOLIA MARINE TRANSPORT COMPANY et al., Defendants.

No. GC 77–135–K–P.

United States District Court, N. D. Mississippi, Greenville Division.

April 11, 1979.

Frank S. Thackston, Jr. and Spivey Gault, Greenville, Miss., for plaintiff.

Joel J. Henderson, Frank J. Dantone, Jr., Greenville, Miss., for defendants.

## MEMORANDUM OF DECISION

KEADY, Chief Judge.

In this admiralty action, Arkansas Valley Dredging Company, Inc. (Arkansas Valley), plaintiff, the owner and operator of the Dredge LITTLE ROCK, sues Magnolia Marine Transport Company (Magnolia) in personam as the owner and operator of the M/V JENNIE DEHMER, for damages resulting from a collision occurring September 28, 1976, in the area of Mile 8.3 on the White River. Plaintiff seeks to recover damages for the cost of repairing the dredge, survey fees, and loss of profits during the period of repairs when the dredge, which had been anchored alongside the navigable channel, was struck by the defendants' towboat.

## I. FACTS

According to the stipulated facts, the dredge, a nonpropelled vessel equipped with cutterhead suction, was 65' long, 22' wide with a 5' draft and was engaged in dredging operations in the early morning hours of the date of the casualty. She was positioned off the right descending bank near the black buoy line marking the deep water channel in a bend of the White River, where shallow water on the left descending shore was indicated by a line of red buoys. The dredge, in charge of leverman Don Phillips, was equipped with two stern spuds starboard and port, and was anchored fore and aft by anchors placed by two dredge tenders, the BOBBY J. and the McBRIDE; connected to the dredge was a series of discharge pipes which led landward to a barge on which the dredge material was loaded. The dredge, under contract with the Corps of Engineers, was dredging downstream to widen the deep water area 60 to 70', with a cutting operation providing for about 9' of water. The deep water in this bend of the river extended approximately 60' beyond the 60' area being dredged by the LITTLE ROCK, thus providing about 120' of water sufficient for the passage of a tow with a 7½' draft.

The M/V JENNIE DEHMER, piloted by James McBunch, was proceeding downstream with one barge in tow, the MM–15, a partially loaded fuel barge 54' wide, 295' long with approximately 7½' draft. The towboat, a twin-screw vessel with 2250 h. p., was 100' long, 30' wide and had a 7½' draft. After passing through the Norrell Lock and Dam two miles upriver, the towboat proceeded about one mile downstream when Phillips, the dredge leverman, made radio contact and ordered her to hold up to give him an opportunity to remove the dredge nearer the right descending shore and away from the black buoy line. The towboat responded by holding up. To accomplish the removal of the dredge, the two tender boats swung the forward anchor to starboard out of the channel, the cutterhead apparatus and both spuds were raised, the stern discharge pipe was disconnected, and, according to Phillips and Jimmy Harden, the pilot of the dredge tender BOBBY J., the dredge was moved backward, or landward, about 30 or 40' away from the black buoy line. This procedure took approximately 30 minutes, and removed the dredge from the deep water channel.

Phillips then radioed the towboat to come ahead, advising that the better or deeper water was on the black buoy line and to run it as near as practicable, and also that the water was shallow along the red buoy line or on the left descending bank. According

to Phillips, when the tow was just a short distance upriver, he noticed the tow was too close to the red buoys in that the vessel was moving about 150' away from the black buoy line. Though it was dark at the time, being approximately 5:45 a. m., both vessels had spotlights on and were in plain view of each other. Phillips testified that the JEN-NIE DEHMER failed to follow his directions but headed for shallow water, causing the barge to ground when the bow of the MM–15 came abreast of the bow of the dredge. He acknowledged that he gave no warning to the JENNIE DEHMER that it was off course and should hold up, testifying that, in his opinion, the vessel was too close upon the dredge and then proceeding at 8 or 10 m. p. h. Phillips, who had no experience as a towboat operator, testified that several tows had passed southbound while the dredge was in the same position to which he had moved it at the time of the casualty in question. However, on the prior watch, the M/V MOHAB EXPRESS, while passing the dredge, had cut off the dredge's elbow anchor and bent a pontoon. The government records indicated that this mishap occurred when the LITTLE ROCK failed to move its anchor, pontoon lines, and the dredge itself, sufficiently to allow that tow to pass.

According to Captain David Evans of the JENNIE DEHMER who was in the wheelhouse at the time of the tow's approach to the dredge, McBunch was piloting the vessel. He confirmed that the leverman had advised them to "run the black, that's where the best water is," and that McBunch had knowledged this instruction. Evans thought that the tow was proceeding a safe distance off the black buoy line and running a proper course. Evans contended, however, that the dredge was still within the channel line, and the position of the dredge had left inadequate deep water for safe passage. According to his testimony, the tow's starboard side was no more than 50 to 75' off the black buoy line where the dredge was sitting. He acknowledged that the JENNIE DEHMER was equipped with a fathometer which disclosed the water depth of the channel to the operator of the towboat. Evans disputed Phillips' testimony about the speed of the towboat, asserting that it was on a one-quarter throttle setting and moving no more than 2 or 3 m. p. h. As the tow approached the bend, McBunch allowed for a right set known to be in the river by steering somewhat to port, when the bow of the barge suddenly grounded and caused it to raise up upon a bar in shallow water. At this point, the dredge and the grounded tow were several hundred feet apart. First McBunch, and then Evans, tried to free the barge by placing the engines in reverse and swinging the stern of the barge and towboat by moving the boat's rudders from port to starboard in an effort to "wiggle" the grounded barge off the bar. For 30 minutes this maneuver was several times accomplished without any problems developing other than that as the stern of the towboat swung to starboard each time it came somewhat nearer to the dredge, but at no time closer than 30'. These efforts, which were within the view of the leverman, failed to free the barge from its grounded position. During this time, the dredge tender BOBBY J., piloted by Jimmy Harden who confirmed the leverman's testimony that the tow had been proceeding off course nearer the red buoys, moved his vessel, which had a 5' draft, to assist in an effort to free the grounded barge by pushing against the port side of the barge as the towboat put its engines in reverse. This assistance proved futile.

Evans continued to engage in these "wiggling" maneuvers by swinging the stern to port and starboard, and as he swung to the starboard, in the direction of the dredge, the current suddenly caught the stern of the towboat and topped it around to collide with the dredge and its discharge piping system. McBunch, no longer employed by Magnolia, did not testify because of defendants' inability to locate him.

Several factual disputes emerged from the testimony. First, Phillips, the leverman, testified that the tow was too close upon him going 8 or 10 m. p. h. to make effective any further warning that the vessel was off course. Captain Evans denied

that the vessel was going at such speed stating that if it had, it could have been stopped upon timely notice within 600′ or well within the distance after the tow came within close view of the dredge and its operating personnel. Another dispute in the testimony was that Evans, in trying to maneuver the grounded barge off the bar, radioed to the dredge for help and specifically requested it to lift the spuds on the dredge and to move it to another location. The evidence does show that request for help was given by the JENNIE DEHMER, but the leverman stated that it came just seconds before the stern of the towboat topped against the dredge and that he had inadequate time to take any effective measures for removal of its position. According to Evans, he radioed for the dredge to move its spuds and to provide greater passage room at least 10 minutes before the collision occurred and that the dredge had ample opportunity to raise both spuds, and the cutterhead suction and remove the dredge LITTLE ROCK from its position of proximity to the grounded towboat and vessel. According to Evans, Phillips radioed back that after checking with his boss, his instructions were not to move the dredge, whereupon he lowered a second spud to the position where the dredge was then located. The leverman denied he gave any such reply to Evans, and his denial was confirmed by Glen Bussell, the government inspector aboard the dredge, and Harden, the pilot of the dredge tender BOBBY J., who had radio contact with the dredge and the towboat. This issue we resolve by finding as a fact that Evans gave the call for help only seconds before the collision, and after he realized he had unexpectedly lost his stern. It is uncontradicted, however, that Phillips gave no instructions to the towboat to cease operations after witnessing its unsuccessful efforts to wiggle free the grounded barge by placing in reverse the towboat engines and swinging from port to starboard, and that he made no effort to further move the dredge LITTLE ROCK out of any position of danger, by either further retreating to his starboard or moving downriver through directions to the dredge tenders, which were serving the LITTLE ROCK and afforded capability for movement upon the leverman's command.

Defendants offered Roy Jackson, an experienced towboat and dredge operator, as an expert witness. He testified that he had operated dredge equipment similar to the LITTLE ROCK, having worked as leverman, dredge superintendent and engineer; that he had also piloted towboats ranging from 300 to 4300 h. p. on the White River, and that his normal run as towboat captain for Flowers Transportation Company caused him to navigate this passage of the White River approximately every 8 days. He was of the opinion that the leverman should maintain a watch and, as soon as he noted the tow was out of shape, give proper instructions, including the stopping of the vessel, and that even if the JENNIE DEHMER had been proceeding at a speed of as much as 8 to 10 m. p. h., it could have been stopped within 400′ with only one barge in tow. Phillips, as dredge operator, would have known better about the water, and a timely caution to the JENNIE DEHMER, in Jackson's opinion, would have probably avoided the grounding. Jackson was of the opinion that during the 30 minutes that the JENNIE DEHMER conducted swinging operations coming to starboard, the leverman should have issued orders to stop the operation to allow him to move the dredge to a location of safety; that this could have been done by raising two spuds, the cutterhead suction and, with the aid of tender boats, moving the LITTLE ROCK out of any place of danger. By doing nothing, the leverman was, in the opinion of Jackson, inattentive to his duties. He felt the instructions "to run the black buoy line as close as possible" were imprecise, and Phillips should have specified the number of feet in view of the narrow channel. Jackson, as a towboat operator, was of the opinion that the speed testified to by Phillips and Harden was quite unlikely inasmuch as shallow water, the narrowness of the channel and the set of the current to starboard would make it difficult to navigate around the bend at such speed. Jackson conceded

that there was no way that Phillips would know that the JENNIE DEHMER would lose its stern and that until this occurred, there was no immediate problem. However, Captain Evans stated that he had, previous to the collision, damaged some of the suction pipe from the wheel wash of his engines. Although acknowledging that no danger existed until it became evident that the JENNIE DEHMER was losing its stern and drifting in the direction of the LITTLE ROCK, Jackson was of the opinion that a prudent operator of the dredge, under such circumstances, would not have had both spuds down but would have been in position to move his rig within several minutes. Jackson also affirmed that a prudent dredge operator would have issued instructions to the towboat captain to stop maneuvers until the dredge, which had capability for quick movement, could be taken to a place of safety, and that Phillips was inattentive to the difficulties being encountered by the JENNIE DEHMER in trying to get the grounded barge back into navigation.

On rebuttal, Phillips, the leverman, testified that the JENNIE DEHMER was no more than 600 to 700′ away when he first realized that the vessel was out of shape and that he did not call the vessel or issue other instructions because it was traveling too fast to halt. In his discovery deposition, Phillips stated that it would take only a few minutes to move the dredge when needed, although at trial he asserted it would take no less than 20 minutes to accomplish that operation. We find as a fact that the position of the dredge constituted no threat to safe navigation of the JENNIE DEHMER and its tow, apart from the sudden loss of stern which Evans had not anticipated in his rudder movements.

The evidence shows that neither vessel blew a danger signal at any time during the backing maneuver.

Under its contract with the Corps of Engineers, Arkansas Valley was required

to conduct the work in such manner as to delay navigation the minimum possible. When the Contractor's plant blocks or partially blocks the navigation channel as to make difficult or endanger the passage of vessels, said plant shall be promptly moved, on the approach of any vessel, to the extent necessary to provide sufficient clearance for safe passage of the vessel. The Contractor shall be responsible for accurately determining the clearance available for the passage of vessels and shall advise vessel pilots of such clearance. The swing anchor buoy shall be located outside the navigation channel so as not to interfere with the safe passage of vessels. (Specifications for Hire of Dredge and Attendant Plant with Corps of Engineers, § 5(d), Deft. Exh. 15, also Pltf. Exh. 3A.)

After the collision, both sides sent marine surveyors to estimate the damage. Plaintiff, however, by use of its 17-man crew on the LITTLE ROCK and the attendant plant to perform labor, its boat and crane standing nearby, made the necessary repairs by installing a new spud, replacing tool box, replacing lost swing cable, one anchor and doing other work so as to complete the repairs within a period of 59 hours and 17 minutes. The cost of these repairs, as made by plaintiff, totaled $5,772, including survey cost, as itemized below.[1] The evidence does not show that after the repairs were made the dredge and its attendant equipment was not as good or as serviceable as before. Indeed, immediately after the time during which plaintiff made repairs, it resumed normal dredging operations, and regained its usual earning capacity. During the 59.-

1. 
| | |
|---|---:|
| 24 hours welding repairs at $12 per hour | $ 288.00 |
| Boat and crane, 36 hours at $35 per hour | 1,260.00 |
| 180 hours labor at $3.75 per hour | 675.00 |
| 1 40′ spud at $27.20 per foot | 1,088.00 |
| 1 tool box with tools | 600.00 |
| 450′ ³⁄₄″ swing cable | 351.00 |
| * 1 anchor, with cable | 1,125.00 |
| Coupling on cutter shaft, 1 day in machine shop with $50 in materials | 210.00 |
| Survey expense | 175.00 |
| | $5,772.00 |

* Only one anchor was lost. Hence plaintiff's claim on this item is reduced by 50%.

17 hours after completion of repairs, plaintiff demonstrated that the dredge earned $10,572.20 (Pltf. Exh. 15A). The LITTLE ROCK continued thereafter to perform its dredging contract with the Corps of Engineers without difficulty. At no time was the dredge or any of its appurtenant parts sent to a shipyard, nor did it incur greater expense as estimated by both marine surveyors who viewed the damage before plaintiff made any repairs. Daniel D. Chewning, representing defendant, estimated the damage at approximately $6,200 (Pltf. Exh. 2), while Robert J. Ross, representing plaintiff, made an estimate of approximately $8,000. Both surveyors anticipated that the repairs would be made by a shipyard and did not foresee the economies which plaintiff was able to accomplish by making adequate repairs at the site of the collision.[2]

The parties conceded that savings effected during the 59.17 hours of downtime would be reflected in labor costs of $2,335.38 and fuel expense of $1,000, or a total savings of $3,335.38. Deducting these savings from the gross earnings of $10,575.20 accrued during the 59.17 hours immediately following repairs result in a loss of net profits to plaintiff of $7,239.82 during downtime. We find as a fact that the total loss which plaintiff sustained was $13,011.82, consisting of $5,772 physical damage and $7,239.82 loss of net profits.

## II. LAW

The parties vigorously dispute both the issues of liability and of damages. Plaintiff contends that the dredge, being an anchored vessel, was in a privileged position, and having moved outside the navigable channel, as we find the facts to be, it was under no duty after having notified the JENNIE DEHMER of its location and given instructions for it to navigate the bend in the river. Plaintiff further contends that even if the leverman had failed to give adequate instructions to the JENNIE DEHMER for safe passage, the towboat carelessly allowed the barge to ground by entering shallow water and that thereafter, for a period of 30 minutes or more, Captain Evans, at the control of the JENNIE DEHMER, undertook to free the barge by backing maneuvers which he thought were reasonable until he lost the stern of the towboat because of the current of the river and topped over against the dredge which had done nothing to place the towboat and its tow in a position of peril. The defendant argues that the leverman's failure to give explicit instructions and to notify the JENNIE DEHMER that it was off course actively contributed to the grounding and that the leverman's failure to move the dredge to another location upon the request of Evans, when the dredge had ready capability to do so, was likewise an act of negligence which primarily caused the collision.

Both sides have cited cases of anchored vessels or dredges in support of their respective contentions. A case most closely in point favoring plaintiff's position is the Fifth Circuit decision of *King Fisher Marine Service, Inc. v. Petroleos Mexicanos*, 428 F.2d 1052 (5 Cir. 1970). The facts of that case closely parallel what occurred here. The dredge LEONARD FISHER was engaged in maintenance dredging in the Brownsville, Texas, ship channel under contract with the United States Corps of Engineers and collided with a tanker as the latter negotiated a turn in the channel. The evidence showed, as here, that at the time of the collision the dredge, which had been working in the channel, had moved to its starboard or south side and was stationary, with its cutter head firmly on the bottom, its starboard spud down and starboard anchor cable taut. In *Fisher Marine*

2. The evidence showed that the LITTLE ROCK had an established earning capacity under the contract with the Corps of Engineers, and had work to perform. Although the contract called for the payment of a gross sum, it provided for periodic payments based on hourly operations of the dredge as follows: $200 per hour when dredging, $160 per hour when standing by for passage of other vessels, and no payment for each hour the dredge was shut down for repairs. Unquestionably, the dredge would have achieved earnings, except for the collision, at comparable rates during the downtime to repair damage caused by the collision.

it was uncontroverted, as here, that the pilot and captain of the tanker were clearly aware of the dredge's position and that the dredge had assumed its position well in advance of the tanker's approach. The collision between the tanker and dredge occurred when the stern of the tanker, in negotiating the turn in the channel, swung too close to the starboard or north bank. This action caused the bow to swing toward the port or south bank of the channel and collide with the stationary dredge. The dredge owner had a contract with the Corps of Engineers containing the identical clause as is present in the contract held by the plaintiff.

In *Fisher Marine*, it was argued, to no avail, that the dredge created a hazardous situation by failing to move quickly enough when the critical situation occurred with the tanker. *Fisher Marine* cited an earlier Fifth Circuit decision, *The Ditmar Koel*, 65 F.2d 555 (1933), which involved a collision between a steamship and a dredge where the dredge did not move out of the marked channel. In the earlier case, the court noted the pilot of the steamship was aware of the presence of the dredge, and this required careful navigation at moderate speed. To the same effect is the decision of our court in *Greenville Gravel Co. v. Illinois Farm Supply*, 215 F.Supp. 560 (N.D. Miss.1963), where the then District Judge Claude Clayton held that the crew of the anchored dredge could not be charged with the duty of safe navigation of towboats and barges past the dredge, especially since the dredge was not anchored in the navigation main channel. See also *Arundel Corp. v. City of Calcutta*, 172 F.Supp. 593 (E.D.N.Y. 1958). We hold in this case that the leverman, upon the approach of the JENNIE DEHMER, took proper action to remove his anchors fore and aft, tender boats and the entire dredge well to the starboard side of the main navigable channel. Necessarily this permitted no less than 120' of deep water for the JENNIE DEHMER to navigate in passing the dredge. We are of the opinion that the instructions of the leverman to hold to the black buoy lines as near as practicable was an adequate instruction to inform the towboat of the good water. In addition, the towboat was equipped with a fathometer which should instruct the pilot in the wheelhouse of the JENNIE DEHMER as to the depth of the water, and, of course, the wheelhouse personnel of the JENNIE DEHMER were aware that the towboat and tow had a 7½' draft and would have to keep within deep water to avoid grounding. Once the grounding occurred, we are of the opinion that Phillips, who had no experience as a towboat pilot, could not be fairly chargeable with negligence by failing to move the dredge as soon as the JENNIE DEHMER began to put her engines in reverse. The proof is that Captain Evans saw no navigational problem as long as the stern of his vessel approached no more than 30' from the stationary dredge, and that losing the stern was an event which was wholly unanticipated by an experienced pilot. Under these circumstances, it would be unjust to charge the leverman with the duty to move the dredge to another location, particularly since as we view the evidence, no request came from Captain Evans until only moments before the collision.

We, therefore, find that the actions of McBunch and Captain Evans were a departure from good seamanship in navigating the channel, which resulted in the negligent grounding of one barge and tow. Their ensuing efforts to free the barge, absent some specific and timely warning from the towboat to the dredge, could not have been reasonably anticipated by the leverman to result in the casualty sustained by the LITTLE ROCK.

As for the recoverable damages, we are of the view that the repairs actually made at the site by plaintiff, which had men, equipment and material to do the job, constituted the full measure of the physical damage since the dredge LITTLE ROCK, with its attendant plant, was restored to a condition as strong, serviceable and seaworthy as it was before the accident. *Dominican Maritime S.A. v. M/V Inagua Beach*, 572 F.2d 892 (1 Cir. 1978). "In other words

[the vessel owner] is only entitled to an award that would give him a boat that is as seaworthy and practically serviceable as before and not to an award, often much larger, sufficient to restore her to the identical condition she was in before the injury." *Zeller Marine Corp. v. Nessa Corp.*, 166 F.2d 32, 34 (2 Cir. 1948).

■ As for loss of profits, it is well settled in admiralty that such are allowed when the proof establishes they have been lost and the amount of the profit is proved with reasonable certainty, the burden of which is upon the claimant. *Bolivar County Gravel Co. v. Thomas Marine*, 585 F.2d 1306 (5 Cir. 1978). The measure of the recovery is limited to net profit so that all savings resulting during the downtime period must be deducted. Plaintiff does not contest this well-settled rule, and concedes deductions should be made as a result of the savings in operating costs and fuel during the time required for the plaintiff to make repairs to the dredge and its attendant plant. *Ove Skou v. United States*, 478 F.2d 343 (5 Cir. 1973); *cf. Huffman Towing, Inc. v. Mainstream Ship. & Sup., Inc.*, 388 F.Supp. 1362 (N.D.Miss.1975).

■ The gross earnings made by the dredge upon the resumption of operations, once the repairs were made, and measured by the interval of time reasonably necessary for repairs at the site of the collision, form a reasonable basis for establishing the earning capacity of the LITTLE ROCK. It seems more logical than taking the average of the entire month of September, as urged by defendant. Resumption was at the same location on White River, and no unusual or abnormal conditions were shown to have been encountered to increase the gross earnings during the 59.17 hours of operation. This conclusion is corroborated by showing the dredge had gross earnings of nearly the same amount for the equivalent period of time preceding the collision.

■ The general rule in admiralty is that a shipowner injured by the tortious collision is entitled to interest from the date of collision. *American Zinc Co. v. Foster*, 441 F.2d 1100, *cert. denied*, 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971); *Petition of Canal Barge Co.*, 323 F.Supp. 805, 823 (N.D. Miss.1971), *modified* 480 F.2d 11 (5 Cir. 1973). Discretion to deny interest must be based upon the existence of peculiar circumstances, *Sinclair Refining Co. v. The S/S Green Island*, 426 F.2d 260 (5 Cir. 1970), and, absent such, it is an abuse of discretion to disallow interest. *American Zinc, supra.*

■ Since we find no exceptional or unusual circumstances present in this controversy to deny prejudgment interest, it will be granted to plaintiff at the rate of 8% per annum from the date of the casualty.

Let judgment be issued accordingly.