**BUNGE CORPORATION,**
**Plaintiff–Appellant,**
**Cross–Appellee,**

v.

**AMERICAN COMMERCIAL BARGE LINE COMPANY and American Commercial Lines, Inc., Defendant–Appellees, Cross–Appellants.**

**Nos. 79–1646, 79–1647.**

United States Court of Appeals, Seventh Circuit.

Argued May 30, 1980.

Decided Sept. 22, 1980.

As Amended Oct. 7, 1980.

---

I.

PELL, Circuit Judge.

This is an action in admiralty. On June 13, 1974, a flotilla of nineteen loaded coal barges in tow of vessels owned by the defendant American Commercial Lines, Inc., collided with a grain handling facility in Cairo, Illinois, owned by plaintiff Bunge Corporation (Bunge).

The damaged structure was composed of a grain conveyor and supporting trestle on four towers. The first of these towers, which supported the trestle over the river, was constructed of four twelve inch diameter pipe pilings and extended approximately seventy feet above the river bottom. The pilings were driven vertically into the river bottom to form a twelve foot square and were braced by steel I beams and channel irons. Resting on the top of this river support tower was a pipe superstructure which consisted of steel pipe and cross–bracing, welded to the tower. The purpose of both the tower and its superstructure was the support of the conveyor trestle, which served as the base for the conveyor belt connecting the grain elevator with the grain discharge chute over the river. In addition to this structure, Bunge's facility also had two dolphins downstream of the river support tower.[1]

On the day of the collision, the river stage was high and the current unusually swift. Defendant's tow, heading downriver, struck a dolphin, and caused it to lay over toward the shore at an angle. Continuing, the barges next struck a work flat moored at the side of the river support tower, causing it to strike the two riverward pilings of the tower. As a result, the tower pilings were deflected shoreward approximately two feet at the top, causing substantial damage to the tower, the superstructure, and the conveyor trestle.[2]

Philip T. Powers, Chicago, Ill., for plaintiff–appellant, cross–appellee.

Michael A. Snyder, Chicago, Ill., for defendants–appellees, cross–appellants.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and CAMPBELL, Senior District Judge.*

* William J. Campbell, Senior Judge of the Northern District of Illinois, is sitting by designation.

1. A dolphin is a piling structure driven into the river bed. It is used to moor barges.

2. At trial, the defendants raised as an issue whether any fault of the plaintiff had contribut-

The court entered judgment for the plaintiff in the amount of $122,234.86, allocable as follows:

(1) For the cost of restoring the conveyor structure to the condition it enjoyed prior to the collision, $135,000, less sixty percent depreciation, for a net liability of $54,000.

(2) For the cost of replacing the damaged dolphin, $46,266, less sixty percent depreciation, for a net liability of $18,506.40.

(3) For expenses caused by the loss of the use of the facility between June 13 and November 4, 1974, including the cost of transferring corn screenings from barges to rail cars, dockage fees, cleaning and transfer charges, and trucking expenses, $30,141.25.

(4) For loss of grain (shrink) in excess of the normal .0075 percent, caused by the necessity of using alternative means of unloading, $10,000.

(5) Barge, switching and trucking charges in the amount of $9,067.01.

(6) Additional trucking expenses in the amount of $520.20.

The court denied plaintiff's prayers for prejudgment interest, costs, and attorneys fees. On appeal, the principal issues are whether the district court erred in computing Bunge's damages in items (1) and (2) and whether the court abused its discretion in failing to award prejudgment interest.

## II.

A. *Damage to the Conveyor Structure*

The following stipulations, admittedly relevant to the question of the correctness of damages, were made a part of the final pretrial order:

7. The damage was surveyed by Louis Vernon Pritchett, the plaintiff's maintenance superintendent; George E. Leithner, on behalf of the plaintiff's underwriter; Richard Goode of the plaintiff's Engineering Department; Harry E. Reynolds and Civil Engineer Paul Lopinot on behalf of the defendant American Commercial Lines, Inc.'s underwriter.

8. Shortly after June 13, 1974, Louis Vernon Pritchett supervised the dismantling of the upper sections of the river tower, the conveyor belt and the conveyor trestle shoreward to the first land tower. At this time the river was high and concealed the bottom where the support piles and dolphins entered the river bed.

\* \* \* \* \* \*

10. The river receeded [sic] and, on October 10, 1974, the pilings and dolphins were accessible for inspection at the mudline. On October 10, 1974, representatives of the parties, including Harry E. Reynolds and Paul Lopinot, made the first unobstructed visual inspection of the condition of the piling of the river tower and second downstream dolphin down to the mudline.

11. Thereafter, repairs commenced to the river tower, conveyor trestle and the conveyor belt support system. These repairs were completed on November 5, 1974, and the facility was used to load barges.

12. In 1975, the plaintiff commenced construction of an additional barge loading and unloading facility, and, as part of this additional facility, six large cylindrical cells constructed of interlocking steel sheet piling filled with concrete were constructed in the river.

13. In the place occupied by the second downstream dolphin, the first upstream cell of the new facility was constructed. In order to make way for this new cell the first downstream dolphin was removed, as was the remaining single pile of the second downstream dolphin.

14. Plaintiff expended $6,681.08 in dismantling the upper sections of the river tower, the conveyor belt and the conveyor trestle shoreward to the first land tower.

ed to the collision or the damage. The court found that defendants had presented no credible evidence in support of their claim, and this issue is not pursued in appeal.

15. Plaintiff expended $26,984.49 to repair the river tower, the conveyor belt and the conveyor trestle shoreward to the first land tower.

It is plaintiff's theory that the $54,000 in damages awarded by the district court for replacement of the conveyor structure was in fact calculated only on the replacement cost of the river support tower, and not the structure as a whole, and therefore improperly excluded the additional $33,665.57 in repair costs to other components of the conveyor structure referred to in stipulations fourteen and fifteen.

The district court expressly rejected this contention noting that "[t]his claim is inconsistent with plaintiff's theory that it is entitled to replacement value of the facility less depreciation, a theory which the court has adopted and upon which judgment is being entered . . . [P]laintiff cannot be made whole for the value of the damaged facility on the formula of replacement costs less depreciation while at the same time additionally claiming damages for the repair cost to the now only partly–used facility." In support of its claim that the additional damages are not duplicative, Bunge argues first that the replacement cost figure of $135,000, adopted by the court, could only have been based on the testimony of George Leithner, plaintiff's expert witness, and that this testimony was limited to the cost of replacing the river support tower only, not the entire conveyor structure. Secondly, plaintiff contends that the stipulated repair costs included only the costs of repairing the superstructure, the conveyor belt, and the conveyor trestle. Thus, in Bunge's view, an award of $54,000 for the depreciated value of the river support tower, and $33,665.57 in repair costs for the remaining components would not represent a double recovery, but rather would merely accord plaintiff the proper measure for each section of the damaged facility.

Defendants, in their cross–appeal, agree that the court erred in failing to award plaintiff the stipulated repair costs as damages, but contend that plaintiff's recovery for damages to the conveyor structure is, as a matter of law, limited to that figure.

■ In an admiralty case, as in a civil action, see Fed.R.Civ.P. 52(a), the findings of fact of the district court may not be set aside unless clearly erroneous. See, e. g., *Feeder Line Towing Service, Inc. v. Toledo, Peoria & Western Railroad Co.*, 539 F.2d 1107, 1110 (7th Cir. 1976). Given this standard of review, we are unable to credit Bunge's assertion that the $135,000, less depreciation, applied to the river support tower alone, rather than to the entire conveyor structure.

The court expressly found that "the reasonable cost of restoring the *conveyor structure* to the condition it enjoyed prior to the collision, *including* replacement of all piling in like kind and quality, was $135,000. . . .", and similarly characterized the measure of damages as "the replacement value of the *facility*." (Emphasis added). We are likewise unpersuaded by Bunge's contention that the undepreciated cost for the river tower was based upon the testimony of George Leithner, which related only to the support tower. While it is true that Leithner's testimony was the only specific mention of the $135,000 figure, there is no indication that the district court in fact based the amount of the award on the figures provided by Leithner, and indeed, many of defendants' witnesses testified to substantially lower amounts. Further, if the court did in fact rely on Leithner's estimates in computing the damages, Leithner's estimate was based upon a bid from the Bultema Dock and Dredge Company, which specified the amount of $135,000 for repairs to the tower *and* the superstructure.

■ We also disagree that the $33,665.57 in repair costs were incurred solely for the restoration of components other than the river tower. Indeed, the language of the stipulation, which states that the costs were attributable to "the river tower, the conveyor belt and the Conveyor Trestle,"[3] per-

---

**3.** Plaintiff's brief quotes the stipulation as referring to "the river tower (Superstructure), the

conveyor belt and the Conveyor Trestle." While it is evident that plaintiff's case would

suades us that this interpretation has no merit. We therefore agree with the trial court that allowing both the $54,000 depreciated replacement cost, plus the cost of repairs, would have given plaintiff a double recovery.

■ With respect to the contention raised in defendants' cross–appeal, specifically, that the only allowable damages to the conveyor structure were the stipulated repair costs, we are also of the view that the trial court's findings of fact are determinative. While we agree with defendants that it is well settled that damages of less than a total loss in admiralty [4] are compensable solely by reference to the costs of repairs, *see, e. g., The Baltimore*, 75 U.S. (8 Wall.) 377, 386, 19 L.Ed. 463 (1869); *Oregon v. Tug Go–Getter*, 468 F.2d 1270, 1273 (9th Cir. 1972); *Zeller Marine Corp. v. Nessa Corp.*, 166 F.2d 32, 33–34 (2d Cir. 1948); *The Elmer A. Keeler*, 194 F. 339, 342 (2d Cir. 1912); *Arkansas Valley Dredging Co. v. Magnolia Marine Transport Co.*, 469 F.Supp. 179, 186 (N.D.Miss.1979); *see generally* G. Gilmore & C. Black, *The Law of Admiralty* § 7–17 (2d ed. 1975), we note also the correlative rule that where the damaged vessel or structure is lost or cannot be restored to its prior condition the damages awardable are based upon market value. *See, e. g., The Baltimore, supra*, at 386; Gilmore & Black, *supra*, at § 7–17; *. cf. United States v. Shipowners & Merchants Tugboat Co.*, 103 F.Supp. 152, 153 (N.D.Cal. 1952), *aff'd* 205 F.2d 352 (9th Cir. 1953), *cert. denied*, 346 U.S. 829, 74 S.Ct. 51, 98 L.Ed. 353 (where vessel damaged and repairs not made, damages measurable either by estimated cost of repairs at time of collision or by diminution in market value).

■ If repairs have been made, the determination of which of the above principles controls the measure of relief in a given action, will depend upon the factual question of whether the repairs were temporary or permanent. This follows from the fact that when damaged property is not restored to a condition equivalent to that it enjoyed prior to the collision, the owner's entitlement to the replacement value of the property is in no way limited by the fact that the owner has made provisional repairs to the damaged structure pending its replacement.[5] *See, e. g., The Elmer A. Keeler, supra; The B.F. Guinan*, 40 F.2d 277, 278 (D.C. Cir. 1930).

■ In this instance, if the trial court had found the repairs to be permanent, *i. e.*, sufficient to restore the conveyor structure to its prior condition, plaintiff's recovery would necessarily be limited to the amount of stipulated repair costs. The court found, however, that "[a]fter the collision, plaintiff made temporary repairs to the unloading facility which did not restore it to its full usefulness." Central to this finding was the fact that prior to the collision, the facility had been used for both loading and unloading barges. The unloading operation had been accomplished by means of a vaculator system which sucked grain out of barges and dropped it on the conveyor system to be transported into the elevators for storage. Defendants do not dispute that the vaculator system was not reinstalled after the collision, and that the facility is no longer usable for unloading barges. The court likewise termed those repairs that were made as "temporary." Thus, while

---

have been aided had the stipulation in fact contained the parenthetical reference to the superstructure, we note that no such language was included, and observe that it is generally helpful to the court to indicate the insertion of additional material through the use of brackets.

4. At one time, when a vessel damaged a shore structure, the resulting action was held not to be within the admiralty jurisdiction. *See The Plymouth*, 70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1866). In 1948, however, Congress expressly provided that the admiralty jurisdiction would extend to all injuries "caused by a vessel . .

notwithstanding that such damage or injury be done or consummated on land." Act of June 19, 1948, 62 Stat. 496 (1948) (codified at 46 U.S.C. § 740 (1976)).

5. Similarly, where a structure or vessel is first temporarily, and later permanently repaired, the damages will not be limited to the stop–gap measure, but will rather be awardable in whatever amount was necessary to return the structure to its original condition. See *The Elmer A. Keeler, supra*.

the facility is still used for loading purposes, in light of the fact that its current function is diminished from its prior usefulness, we do not think that the district judge's finding that the repairs were temporary is clearly erroneous. Given this finding the court correctly computed the damages based upon the replacement costs less depreciation.

### B. *Damage to the Dolphin*

█ Defendants have also contended in their cross–appeal that the court erred in awarding $18,506.40 in replacement costs, less depreciation, for the damaged dolphin. In support of this claim, defendants argue that the dolphin had no useful life left, that it was never repaired or replaced, but rather was merely removed from the river, and that plaintiff had no future use for the dolphin as it intended to build, and has in fact built, a new facility at another location. Plaintiff argues that while a feasibility study of adding another facility has been underway for several years, no decision was reached until the collision damaged the structure in question.

The trial court found, contrary to defendants' contention, that the dolphin was only sixty percent depreciated, and noted, we think correctly, that the fact that plaintiff had constructed a new facility rather than restored the old one, was not relevant. In *United States v. Shipowners & Merchants Tugboat Co., supra*, the United States, as libellant, did not repair its damaged vessel, but instead sold it for the full statutory price at which vessels of its class could be sold. The court rejected a claim by the owner of the tug which caused the collision, that damages for estimated repair costs were not allowable in such a case, applying the principle from tort law that a tortfeasor cannot escape the consequences of his wrong by the mere fact that the victim has received compensation from a collateral source. 103 F.Supp. at 153. We think that Bunge's facility had forty percent of its useful life remaining, and defendants are responsible for the damage that their vessels inflicted. This liability is unaffected by Bunge's decision to construct a new facility rather than replacing the dolphin in its original location.

### C. *Prejudgment Interest*

█ The final issue is whether the district court abused its discretion in failing to award plaintiff prejudgment interest. The general rule in admiralty is to award prejudgment interest from the date of the collision in order to ensure that the plaintiff is compensated in full. *See e. g., United States v. Motor Vessel Gopher State*, 614 F.2d 1186, 1190 (8th Cir. 1980); *American Zinc Co. v. Foster*, 441 F.2d 1100 (5th Cir. 1971), *cert. denied*, 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95. As the court observed in *The President Madison*, 91 F.2d 835, 845 (9th Cir. 1937), "[p]arties injured by a tortious collision are entitled to just compensation for the wrong done them. This includes interest from the date of the sinking . . . .. The trial judge's discretion to deny such just compensation is based upon peculiar facts of a case, showing that the injured parties have deprived themselves of such compensation. Admiralty uniformity requires that just compensation should not vary from port to port . . . .." (Italics in the original). *See generally The Umbria*, 166 U.S. 404, 421, 17 S.Ct. 610, 617, 41 L.Ed. 1053 (1897) (general rule in cases of loss through collision damage is value plus interest from time of collision).

 While discretion to deny interest does exist, given some special circumstance such as the assertion of frivolous claims or a delay in bringing the action, it has been held that the mere fact that the plaintiff sought damages in excess of those awarded by the trial court does not constitute a sufficient basis for denying an award of prejudgment interest. *See United States v. Motor Vessel Gopher State, supra*. It is further generally considered an abuse of discretion for a court to deny interest, as was the situation here, without articulating any reason for its action. *See Arkansas Valley Dredging v. Magnolia Marine Transport Co.*, 469 F.Supp. 179 (N.D.Miss.1979).

The cases relied upon by defendants do not hold to the contrary. In *Iberian Tankers Co. v. Gates Construction Corp.*, 504 F.2d 747 (2d Cir. 1974), the court did not hold, as defendants contend, that a district judge has broad discretion to deny interest, but rather merely that one of the special circumstances which might justify denial of interest was presented when the then applicable equal division of damages rule [6] led to a particularly harsh result in a given case. Similarly, in *Fireman's Fund Insurance Co. v. Standard Oil Co.*, 339 F.2d 148 (9th Cir. 1964), the Court of Appeals for the Ninth Circuit upheld the district court's exercise of discretion to deny interest because of an unusual circumstance, specifically, that the plaintiff had introduced no evidence that it had been deprived of the use of the damaged vessel at any time subsequent to the collision. As our recitation of the facts in this case indicates, no such circumstance is present here.

We therefore hold that the trial judge abused his discretion in denying Bunge's prayer for interest from the date of the collision. We remand the action to the district court for a determination of the appropriate rate of interest during the relevant time period, *see United States v. Motor Vessel Gopher State, supra*, 614 F.2d at 1190, and for entry of a judgment consistent with this opinion. The parties shall bear their respective costs on appeal.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

[6.] That rule, which had mandated that property damage in a maritime collision be equally divided whenever two or more parties were at fault, regardless of the relative degrees of their fault, was abandoned by a unanimous Court in *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), in favor of a rule requiring that liability for damages be allocated among the parties proportionately to their fault.